[Decided February 3, 1887.]

## JEFF. J. HARLAND v. TERRITORY OF WASHINGTON.

1. QUALIFICATION OF JURORS — WOMEN. — Women are not competent to serve as jurors, grand or petit, under section 2078 of the Code, providing that "all qualified electors shall be competent to serve as petit jurors, and all qualified electors and householders shall be competent to serve as grand jurors," notwithstanding an act passed subsequently to the enactment of the Code making women qualified electors.  GREENE, C. J., dissenting.

2. CONSTITUTIONAL LAW — EXPRESSING OBJECT IN TITLE OF STATUTE. — The designation of an act in its title as an act to amend a specified section of the Code, without any other or further expression of the object of the act, is not a sufficient compliance with the requirement of the Organic Act of Washington Territory (U. S. R. S., sec. 1924), which prescribes that "every law shall embrace but one object, and that shall be expressed in the title."

3. SAME — ELECTIONS — WOMAN SUFFRAGE. — Act of legislature approved November 23, 1883, entitled "An act to amend section 3050, chapter 238, of the Code of Washington Territory " (Sess. Laws, p. 39), is unconstitutional and void, because its object is not expressed in its title.    The same is true of the act approved January 29, 1886 (Sess. Laws, 1885-86,

p. 113), and of an act approved February 3, 1886 (Sess. Laws, 1885-86,
p. 128), except so far as it purports to amend sections 3079 and 3084 of
the Code.   GREENE, C. J., dissenting.

4.  EXTRADITION — CHARGE — INDICTMENT. — In the case of interstate extra-
dition, a prisoner extradited upon a certain charge may be tried for an
offense slightly different from the charge, if nothing appears to suggest
fraud in procuring the extradition.   Per LANGFORD, J.

5.  INDICTMENT — DESCRIPTION OF OFFENSE — GAMING. — An indictment un-
der section 1253 of the Code charging the defendant with the crime "of
unlawfully and feloniously carrying on a swindling game called twenty-
one, or top-and-bottom dice," without any other or further description of
these games than by such names, is too indefinite and insufficient.   Per
LANGFORD, J.

6.  CRIMINAL PRACTICE — JUDGMENT — GAMING. — A verdict of guilty as
charged, upon an indictment for carrying on the swindling game of
twenty-one, or top-and-bottom dice, is insufficient to warrant a judgment
of conviction for carrying on the swindling game of top-and-bottom dice,
and omitting any reference to "twenty-one."

ERROR to the District Court holding terms at Tacoma.
Second District.

On the seventeenth day of May, 1886, one Jacob C.
Livensparger made complaint before a justice of peace
for Pierce County, that the plaintiff in error, Jeff. J.
Harland, and two others, " did unlawfully and feloniously
carry on, open, and conduct a gambling and swindling
game called bunko, or twenty-one, for money, and did
then and there unlawfully and feloniously and fraudu-
lently obtain of the said J. C. Livensparger by such
gambling and swindling game called bunko, or twenty-
one, the sum of $610, contrary," etc.

Harland being a resident of Oregon, upon such com-
plaint the governor of the territory made requisition
upon the governor of Oregon to surrender said Harland
for trial, and the governor of Oregon upon such demand
surrendered the said Harland, the warrant of arrest re-
citing the offense charged in the language of the above
complaint, *in ipsissimis verbis.*

After such arrest plaintiff in error was indicted under
section 1253 of the Code with the crime " of unlawfully
and feloniously carrying on a swindling game called

twenty-one, or top-and-bottom dice," etc.   The indictment did not include "bunko," as charged in the original complaint upon which the extradition warrant was issued; and the plaintiff in error claimed that, having been extradited to be tried for a crime charged in specific language, he could not be tried for a different one, and that the jurisdiction of the Court to try him was limited to the specific charge set forth in the original complaint.

When the grand jury was impaneled, the plaintiff in error challenged five of its members for not being householders, it appearing that each of the jurors so challenged was a married woman living with her husband in the same house as members of the same family, which challenges were overruled by the court.

Plaintiff in error further objected that the indictment was insufficient and uncertain, and failed to charge him with any crime.

All of the above objections were urged in a plea to the jurisdiction and demurrer to the indictment, and afterwards renewed by motion in arrest of judgment, all of which were severally overruled, and appeal taken to this court.

*Mr. Elwood Evans*, for Plaintiff in Error.

To qualify a person to serve as a grand juror, he must be a qualified elector and a householder. (Code, sec. 2078.) This provision has not been expressly repealed by any subsequent statutes purporting to confer the right of suffrage upon women. Repeal or modification of a statute by mere implication is not favored. (Sedgwick's Statutory and Constitutional Law, 125–127; Potter's Dwarris on Statutes, 156; *Minor* v. *Happerset*, 21 Wall. 176; *Bowen* v. *Lease*, 5 Hill, 225; *People ex rel. Freeman* v. *Barr*, 44 Ill. 198; *McCool* v. *Smith*, 1 Black, 459; *Henderson's Tobacco*, 11 Wall. 652.) The legislature did not mean to legislate as to juries, while undertaking to amend election laws. *(Robinson's Case*, 131 Mass. 377–381;

Greene, C. J., in *Jackson* v. *Wynne*, in Port Townsend District Court, September, 1884.) Service on juries is in no sense a right or privilege, but a burden on citizenship. A burden cannot be imposed except by *positive* enactment. (Thompson and Merriam on Juries, sec. 39.) A radical revolution of such a system as the grand jury system, or the relations of husband and wife in family discipline or government, can only be effected by *express* statutory enactment. (Thompson and Merriam on Juries, sec. 480; *Robinson's Case, supra; Bradwell* v. *Illinois*, 16 Wall. 130.) A householder is the head of a family occupying a house, or a person providing for a household or the head, master, or person, who has charge of a family. (1 Washburn on Real Property, 342 et seq.; *Bourne* v. *Witt*, 19 Wend. 475; *Woodward* v. *Murray*, 18 Johns. 400; Sess. Laws 1885–86, pp. 96, 97; Code, secs. 342, 347.) The husband is the natural head of the family. (Bishop on Law of Married Women, sec. 45–49.) The wife, during life of husband, is not a householder. (1 Washburn on Real Property, 342 et seq.; Thompson on Homesteads and Exemptions, sec. 65; Smyth on Homestead and Exemptions, sec. 532.) Such is the meaning of the word "householder" in exemption statutes, and the construction of such terms in such statutes has been adopted in construing jury laws. (Thompson and Merriam on Juries, sec. 174.) By the common law, husband and wife are but one person, and that one is the husband. During coverture the wife's legal existence and authority are suspended except as modified by statute. (2 Kent's Com. 120.) Chapter 183 of the Code contains all statutory changes from the common law made relative to the rights of husband and wife, and the title of this act, which is bound to express its objects, states its object to be the regulation of "the *property* rights of married persons." By sections 2409 and 2410 of Code, the husband is made manager of community property. By section 2415, he alone is permitted to make selection of homestead. By

section 2399, the mother does not come into control of the children until the death of the husband or father. The above-cited provisions of the Code were intended to change the common law regulating the institution and government of the family.   The specific designation who shall thus exercise these acts of authority or control strongly demonstrates that innovation and implication without express words of intendment cannot revolutionize these laws of marriage and household divinely instituted at the dawn of creation, as every system of religion teaches.

The act of the legislature (Sess. Laws 1883, p. 39), and acts amendatory thereof, purporting to confer the elective franchise upon women, are unconstitutional and void. Counsel argued the proposition to the Court, but cited no authority.

The court, by the extradition proceedings, acquired no jurisdiction to try the plaintiff in error for any offense except that mentioned in the original complaint upon which he was extradited.   (Spear's Law of Extradition, p. 87, sec. 7.)    This is as applied to international extradition, and the rules governing state extradition are analogous to the former.   (Id., sec. 4, p. 550.)   If one crime is alleged in the original complaint, the extradition proceedings are a nullity.   (Code, sec. 1253; *State* v. *Gitt Lee*, 6 Or. 426; *In re Lee Tong*, 18 Fed. Rep. 253.)

The indictment is insufficient.   It fails to allege the manner of conducting the game, so as to show it was a swindling game, or a gross and systematic imposition and swindle upon the loser.

*Mr. Fremont Campbell, Prosecuting Attorney,* for the Territory.

All married women, otherwise qualified, are competent grand jurors.   (*Rosencrantz* v. *Territory,* 2 Wash. 267.) The court properly overruled the plea to the jurisdiction of the grand jury.   (Code, secs. 1283, 985, 951.).   The

court properly overruled the demurrer to the indictment. (Code, secs. 1253, 1015.) The proviso of section 1253 of Code makes ample provision for the punishment of all kinds of swindling games, and it would be impossible for a statute to designate by name therein every crime that might be committed.

Mr. Justice TURNER delivered the opinion of the court.

A question arises in this case which was before the court at its July term, 1884, namely, the question whether married women living with their husbands are competent grand jurors in this territory. The question was then decided in the affirmative, but by a divided court. (*Rosencrantz* v. *Territory,* 2 Wash. 267.) Since that decision there has been a change in the membership of the court, and a majority of the quorum sitting in this case finds itself unable to agree with the views expressed or the conclusions announced in the first decision.

Two members of the court, however, yet adhere to that decision. . This circumstance gives ground for hesitation in overruling the same; but there are several reasons which the present majority think justify them in giving effect to their views, and which will be likely to prevent embarrassment therefrom in the future administration of the law.

1. We think the first opinion reached did not meet with the concurrence of the bar of the territory. It established no rule of property, and its principles have not been long applied.

2. A new question not argued or passed on in the first case arises in this case, and is decisive of it.

3. Both of the judges who adhere to the first opinion, after a service of long duration, in which they have honorably illumined our judicial history by great learning and ability, and by the purity of their lives and the uprightness of their official conduct, are about to retire from office by reason of the expiration of their terms.

It is proper for me to add here that the membership of the court may be still further changed in the near future, and speaking of myself alone, without such great detriment to the public interest.

I pass, then, without further preliminary remarks, to a consideration of the reasons which in my judgment properly govern the question.

I shall not reiterate the arguments embraced in the dissenting opinion read by me in the first case. Although presented most imperfectly by reason of the haste in which that opinion was prepared, the views there expressed yet seem conclusive to my mind against the opinion then reached by the majority of the court. There are, however, some additional thoughts pertinent to the reasoning of the majority in the first case to which I will advert before going on with the new question involved.

Section 3078 of the Code provides that "all qualified electors shall be competent to serve as petit jurors, and all qualified electors and householders shall be competent to serve as grand jurors."

At the session of 1883–84, the legislature passed an act entitled "An act to amend section 3050, chapter 238, of the Code of Washington Territory," which act, if valid, makes females of like age with males qualified electors. The claim is that females are competent jurors by reason of these two statutes.

From the earliest period in the history of the common law, jurors, grand and petit, have been composed of men. The language of the *venire facias* was that they be *liber et legalis homo*, and according to Blackstone, "under the word *homo*, though a name common to both sexes, the female, however, is excluded, *propter defectum sexus.*" When legislators have prescribed the qualifications of jurors, the requirement that they should be males has always been implied. Section 2058 of the Code carries with it that implication, and undoubtedly that which is

implied would have been clearly expressed if it had ever occurred to the members that a subsequent legislature would confer the elective franchise on females. Whatever may be thought of the propriety of making females voters, there is but one opinion among the great mass of the people, male and female, concerning the imposition on the latter of jury duty, and that opinion is firmly and unalterably against such imposition. The legislature which passed the suffrage act, coming from the people, and representing their sentiments, cannot be supposed to have intended the accomplishment of that which the people so universally disapprove, and it is fair to suppose that they would have expressly limited the effect of their act if they had foreseen the lengths to which it would be attempted to carry it. However this may be, the later act dealt entirely with the elective franchise, and as I have heretofore shown, it could not lawfully have had in contemplation any other object.

Neither of the legislatures, then, responsible for the respective acts, the joint operation of which is held to make females jurors, having contemplated such a thing, it is manifest that that result can be arrived at only by a process of judicial construction which servilely follows the letter of the law and sacrifices the spirit. Thus that is made to be law which was never in the mind of any except the most visionary enthusiast. Well may it be exclaimed in the face of such judicial exposition, "The letter killeth, but the spirit giveth life."

The body of our law may be likened to an ocean, both because of its extent and its characteristics. Every atom is in juxtaposition with its neighbor, the whole pliable and yielding, and yet forceful, and notwithstanding its immense force, subject to influence and modification by the slightest addition. Every addition which may be made to the mass forces back the several parts with which it comes in contact, as far as it may and ought, while the whole confines the part to its just and

proper limits. No law can be considered alone and by itself. Every law carries with it impliedly, in spite of its terms, limitations and extensions which the great mass of the law forces on it and into it. These limitations are infinite, and as extensive as the law itself. An illustration in point is the rule of the common law that a child under seven years of age is incapable of any crime. Mr. Bishop, the most philosophical of all our law-writers, thus speaks of the limitation thus mentioned: "Therefore, when a statute creates a crime, its terms, however general, are no more applied to such a child than are similar terms of the common law. And this sort of interpretation extends through all our laws, the written and the unwritten alike. The books contain cases in which counsel and the courts forget it; but none in which judicial persons, with their eyes open and duly warned, deliberately reject it. We sometimes read in judicial opinions that those pronouncing them deem it due to the legislature to follow its directions, and not to make exceptions where it has made none; but this sort of language should not be taken as a denial of what every person familiar with our reports knows; namely, that no judge ever deliberately undertook to administer a statute without admitting those exceptions to it which are recognized in the other parts of the legal system. Nor did any legislative body ever proceed on the idea that its enactments are to be put in force by courts so ignorant of legal affairs as to deem them meant for independent rules to be limited by no others, and to override all laws antagonistic to their general words. For legislatures and courts alike recognize the fact, which common sense teaches to every thoughtful person, that it is neither possible nor desirable in any system of laws to attach to each particular law every qualification embraced in every other. So voluminous would the laws thus become, and so often would conflicts be found in them, in spite of every legislative caution, and so diffi-

cult would it be to explore their immense masses, that their usefulness would be indefinitely diminished." (Bishop on Statutory Crimes, sec. 117, 117 a.) In view of this forcible and conclusive exposition of the relations to each other of laws, old and new, it needs only to remember the conditions surrounding the subject at the time section 2078 was enacted, to gain the assent of the mind to the proposition that the implication must have attached to that law that jurors, both grand and petit, should be qualified electors, *who are males.*

Ought this limitation to be destroyed by implication derived from a legislative act which confessedly deals with another subject? I think not. The change is so marked, and the labor and responsibility which it imposes so onerous and burdensome, and so utterly unsuited to the physical constitution of females, that we ought not to depart from the old order without the most indubitable evidence that the legislature so intended. We are not without high authority on this precise question. The Supreme Court of Massachusetts, in a case where the statute under which a female claimed the right to assume the office of an attorney at law was broad enough to sustain her claim, denied her the right on the precise ground here put. (*Robinson's Case,* 131 Mass. 377.) In discussing that case the court says: " The intention of the legislature in enacting a particular statute is not to be ascertained by interpreting the statute itself alone, and according to the mere literal meaning of its words. Every statute must be construed in connection with the whole system of which it forms a part, and in the light of the common law and of the previous statutes upon the same subject; and the legislature is not to be lightly presumed to have intended to reverse the policy of its predecessors, or to introduce a fundamental change in long-established principles of law."

In a case arising in Illinois, the Supreme Court of that state made a similar decision upon similar reason-

ing, and the action of that court was affirmed, on appeal, by the Supreme Court of the United States. (*Bradwell v. Illinois*, 16 Wall. 130.)   The language of Judge Bradley in the latter case is worth quoting at length: "The claim that, under the fourteenth amendment of the constitution, which declares that no state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, the statute law of Illinois, or the common law prevailing in that state, can no longer be set up as a barrier against the right of females to pursue any lawful employment for a livelihood (the practice of law included), assumes that it is one of the privileges and immunities of women as citizens to engage in any and every profession, occupation, or employment in civil life.   It certainly cannot be affirmed as an historical fact that this has ever been established as one of the fundamental privileges and immunities of the sex.   On the contrary, the civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman.   Man is, or should be, woman's protector and defender.   The natural and proper timidity and delicacy which belong to the female sex evidently unfit it for many of the occupations of civil life.   The constitution of the family organization, which is found in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood.   The harmony, not to say identity, of interests and views which belong or should belong to the family institutions is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband."

Thus we see that the fourteenth amendment, which certainly spreads its protecting shield over females because females are citizens, is yet not strong enough to overcome the implied limitations of prior law and custom with which it was brought into association when it was adopted.

In another case well known to the profession the Supreme Court of the United States, without any express law or rule of court to prevent, refused to admit a female to practice as an attorney at its bar. So, also, upon a similar application did the Supreme Court of Wisconsin. I regret that I am unable to refer to the volume containing the admirable opinion of Chief Justice Ryan in the Wisconsin case.

One other reference will suffice on this branch of the case. The chief justice of this court, in a case in his district in which it was attempted to take advantage of a legislative blunder, whereby in attempting to add a clause to a statute all except the added clause was repealed, said: "There can be no reasonable question, then, it seems to me, as to the intent of the legislalature. Anybody of any sense who is not a lawyer or a judge can tell at a glance what that intent is. When a man becomes a lawyer he does not have to lose his wits, nor does a judge have to be a fool. I desire never to be one of those judges who when they discover in the legislative proceedings a clerical mistake, inadvertence, or blunder will push it to extremity, and give to an unhappy effort of expression a sense and power palpably never intended, and permit the awkwardness of a phrase to work ruin and desolation to the poor." (Greene, C. J., in *Jackson* v. *Winn*, Port Townsend Term.) This is most excellent language, and the principles which it announces are extremely pertinent to the question presented in this case. They are decisive of it.

I pass now to the question not considered in *Rosencrantz* v. *Territory*, 2 Wash. 267. That question concerns the validity of the act of the legislature conferring on females the elective franchise. Of course, if that act is invalid, the whole superstructure of the argument by which female jury duty is demonstrated falls to the ground a broken and shapeless mass. The objection-

able feature of that law is its title, which reads: "An act to amend section 3050, chapter 238, of the Code of Washington Territory." The organic act of this territory declares, as one of the limitations on legislative action, the following: "To avoid improper influences which may result from intermixing in the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." Is an amendatory act of our legislature, the object of which is indicated in the title by a reference only to the section of the Code intended to be amended, a compliance with this mandatory direction?

The language of our Organic Act is identical with that used in the constitution of New Jersey. In each of the states of Minnesota, Kansas, Kentucky, Nebraska, Alabama, South Carolina, Tennessee, and Arkansas, the language of the constitution is: "No law shall embrace more than one subject, which shall be expressed in its title." In Michigan the language is the same, except that the word "object" is used instead of "subject." The language in Wisconsin and New York is: "No local or private bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." California, Texas, Indiana, Oregon, and Iowa have provisions similar to Kentucky and the other states in that class, with the addition that "if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in its title."

The following, taken from the language of the courts, will indicate the purpose for which such constitutional restrictions were adopted:—

"I would observe that the traditionary history of this clause is, that it was inserted in the constitution of 1798 at the instance of General James Jackson, and that its

necessity was suggested by the Yazoo act; that memorable measure of the 17th of January, 1795, as is well known, was smuggled through the legislature under the caption of an act 'for the payment of the late state troops,' etc." (Lumpkin, J., in *Mayor of Savannah* v. *State*, 4 Ga. 26.)

"The purpose to be effected by this section was to prevent the incorporation in one bill of provisions of a nature totally diverse and without necessary connection, with a view to effect a general combination of the particular friends of each measure, and thereby secure their enactment, when some or all of them would likely fail if left to stand on their own merits; and also the entrapping of legislators into the support of a bill into which by dexterous management some insidious provision had been inserted of which the title gave no intimation." (*Albrecht* v. *State*, 8 Tex. 216.)

"These provisions were adopted to prevent the legislature from passing what are commonly known as 'omnibus bills.'" (*Fletcher* v. *Oliver*, 25 Ark. 199.)

"The object of this provision was, that neither the members of the legislature nor the people should be misled by the title." (*Sun Mutual Insurance Co.* v. *Mayor etc. of New York*, 8 N. Y. 239.)

"The intent of this provision of the constitution was to prevent the union in the same act of incongruous matters, and of objects having no connection or relation. And with this it was designed to prevent surprise in legislation, by having matters of one nature embraced in a bill whose title expressed another." (*State* v. *County Judge*, 2 Iowa, 260.)

"The object of this constitutional provision was to require so clear an expression of the subject of the bill in the title, that it would at once apprise legislators and others interested of the precise subject of the proposed legislation." (*City of Kansas* v. *Payne*, 71 Mo. 159.)

Mr. Cooley, after an examination of all the authorities,

sums up the object and purpose of such provisions thus: "It may, therefore, be assumed as settled that the purpose of these provisions was: 1. To prevent hodge-podge or log-rolling legislation; 2. To prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and very carelessly and unintentionally adopted; and 3. To fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard therein by petition or otherwise, if they shall so desire." (Cooley's Constitutional Limitations, 5th ed., 173.)

The provision of our Organic Act now under consideration was adopted by Congress in view of all these provisions of the state constitutions, with which, and with the construction of which, senators and members were entirely familiar; and undoubtedly the purpose to be accomplished was the same as that accomplished by the state constitutions. An attempt has been made by some to draw a distinction, because the act of Congress use the word "object" while most of the state constitutions use the word "subject." We have seen that the constitutions of Michigan and New Jersey use the word "object," and as the former state is the home of Mr. Cooley, that eminent jurist, in stating the purpose of all these provisions, would most likely have seen and stated the distinction, if one in fact exists. Moreover, if any distinction is to be made, it seems to me that the word "object," in the connection in which it is used, is obviously of broader significance than the word "subject." "Object" may be used as having the sense of effect,—the thing intended to be accomplished; not the means by which it is to be accomplished, which is properly the subject. For instance, the object of the act in question was to confer the elective franchise on females; its sub-

ject was the subject-matter on which, in accomplishing that object, the legislative will operated, namely, the section of the Code defining the qualifications of electors. I do not, however, lay particular stress on the use of the word "object" instead of "subject" in our Organic Act. For all practical purposes, the words are synonymous, as indicated by Mr. Cooley.

In applying the provisions in state constitutions, the courts have uniformly held that a very general statement in the title of the purposes of the law will be sufficient. Still, it is held that the titles must afford some indication at least of the object of the laws or the effects of their provisions. The object or subject which the title shall express must be set forth with sufficient fullness to give the members who are to vote on the law, and the people for whom they vote, some idea of the change which the new law proposes to make. A very meager expression will be sufficient, but some expression there must be. The expression of a purpose to amend a particular section of the Code gives it to be understood that the law is to be changed; but what the law is that is to be changed, and in what respect it is to be changed, is a matter left entirely in the dark. As every law makes some change in previously existing law by adding to or subtracting therefrom, the title "An act" would appear to convey fully as much actual, present information. It is true that the title under consideration gives a reference to a source from whence information may be derived as to the law proposed to be changed, but it gives no idea whatever indicative of the change that is to be made. When the seeker after information gleans all that the reference indicates, he is driven back to the body of the new law to find what the change is to be,—a source from which he never would have strayed if the object of the new law had been accurately expressed in the title.

But I think a mere reference insufficient, however full the information to which it may lead. The makers of

our fundamental law were dealing with conditions as they knew them to exist.  In theory, legislators inform themselves carefully and laboriously of the effect of the laws upon which they vote.  In practice they do not.  Laws are often passed by their titles alone.  They are very rarely referred to in publications, official or otherwise, prior to their passage, except by their titles.  Knowing this fact and accepting it, and with the design of making the best of it, our constitution makers gave their mandate, intending to obviate as far as possible the evils resulting from this lax way of doing business.  If legislators are too busy or too negligent to have read in full or to read laws upon which they are to vote, how vain to expect them to read laws which the laws they are to vote are to affect, with the sole purpose of determining therefrom whether it is worth while to read the laws upon which they are to vote.

Congress had no such absurdity in mind, but it intended that the titles to laws should be in themselves an index to their purpose, so that on hearing them read or on reading them the attention of members and of citizens as well would be excited, and their energies stimulated to an examination of the proposed laws.  It seems to me that it is paltering with the act of Congress to say that the object of a particular law is to amend a section of the Code, and that the title is sufficient if it express that much.  It would be equally accurate to say that the object of all penal laws is to secure the peace and good order of society, and that laws denouncing robbery, burglary, or larceny would have their object adequately expressed by the title, "An act to secure the peace and good order of society."  The latter title goes as far beyond as the former stops short of expressing the true object.  The object of an amendatory act is not to amend.  Such a construction is too narrow; it sticks in the bark.  Legislatures do not amend simply with the object of amend-

ing; the object in every case is to introduce some new substantive rule of action by the new law, or to abrogate some such rule in the old law. It is attached to the old law because its provisions are supposed to be germane to that law. It might be enacted without reference to it; in which case its title would be required to give intimation of the new rule. What magic is there in the name "amendment" which exempts a law to which it is tacked from the salutary provisions applicable to every other law?

Fortunately, we are not without authority to guide us on this point. It has been held in New York several times that reference in the title of a law to a particular section of the law to be amended is not a sufficient compliance with the constitution. The title itself must give information, and not simply a reference to sources of information. (*People* v. *Hills*, 35 N. Y. 449; *People* v. *Briggs*, 50 N. Y. 553; *Tingue* v. *Village of Port Chester*, 4 N. E. Rep. 625.) The last case was decided January 19, 1886.

The same thing in effect has been held in Minnesota. The title of an amendatory act not indicating its object further than was done by the incorporation therein of the title of the act amended, it was held that provisions in the amendatory act not fairly within the object described by the title of the original act were invalid. (*People* v. *Godway*, 28 N. W. Rep. 101.)

The logic of this case is clearly that a reference to the title of the old law is sufficient only when that title is broad enough to cover the things provided for by the new law. *A fortiori*, if the old law have no title indicating its contents, a reference to it would be entirely insufficient.

The same court in another case cites the New York cases, but guards against their adoption to the full extent, because not necessary for the decision of the case then before it. (*State* v. *Smith*, 28 N. W. Rep. 241.)

A decision in Indiana is much to the same effect as that first quoted from Minnesota. (*State* v. *Bowers*, 14 Ind. 195.)

A Michigan decision appears to be to the same effect. In a case in that state an amendatory act was sustained, the title of which referred to particular sections of a certain act, the title of which was included in the title of the amendatory act, and a section of the old act not described in the title of the new act was held properly amended. The case, which is not very clear, evidently proceeded on the ground that the reference to the title of the old act was in itself a sufficient indication of the things which the amendment might accomplish. The following expression is peculiarly in point on the matter here involved: "The practice of amending by reference to sections instead of by reference to the subject or to the entire statute is one which creates a great deal of mischief, and in no way carries out the real design of the constitution, and is of no practical value in most cases in indicating what changes are to be made or what precise object is in view." (*Comstock* v. *Judge of Superior Court*, 39 Mich. 195.)

The courts of California appear to maintain the same doctrine. The following is the latest decision in full of the Supreme Court of this state: "We are of opinion that the act of the legislature entitled 'An act to amend sections 4000, 4003, 4004, 4006, 4022, 4023, 4024, 4025, 4026, 4028, 4029, 4046, 4087, 4133, 4104, 4109, 4115, 4116, 4119, 4165, 4192, 4204, 4221, 4256, 4314, 4328, 4329, 4344, and to add two sections, to be known as sections 4292 and 4348, and repeal sections 4005, 4105, 4106, 4110, 4111, 4134, 4304, and to establish a system of county government,' approved April 22, 1880, is in conflict with the constitution of the state, and void." (*Leonard* v. *January*, 56 Cal. 3.) As there is nothing in the opinion to lead to the conclusion that the different things proposed in the act were incongruous, the only objection

which is indicated is the obscurity of the title of the act. Such appears from the brief to have been the objection urged by counsel.

It appears, on the contrary, to have been held in Georgia that the title of the act is sufficient if it refers to the section of the statute amended. (*Wheeler* v. *State*, 23 Ga. 9.) Also in Arkansas. (*Noonan* v. *Curry*, 27 Ark. 440.) It appears also that the title of a repealing statute is sufficient in Louisiana if it designates the section repealed. (*Smith* v. *Garrett*, 29 La. Ann. 637.) The last cases are taken from a digest. How accurately the points decided are digested I have no means of knowing. An Alabama case found in the same work does not, however, bear high testimony to its accuracy. Concerning the Louisiana case, if it be correctly reported, distinction is to be drawn between a repealing act and an amendatory act.

A reference in the title of the former to the section repealed manifestly gives reference to a source of information leading to a perfect knowledge of all that is proposed to be done.

Scattered throughout the reports and text-books are many expressions to the effect that the incorporation in the title of the amendatory or repealing act of the title of the act to be amended or repealed is a sufficient compliance with the constitutional requirement. This is undoubtedly true; and it is true because the subject of an amendatory act is required in all cases to be germane and congruous to the general object of the original act which it affects, and to recite the title of the original act in the title of the amendatory act is to express the subject of the amendment in the amendatory act. This view explains many cases which are quoted as authority for the proposition that a reference to the amended law is sufficient. Of this class are *State* v. *Bowers*, 14 Ind. 195; *Yellow River Improvement Company* v. *Arnold*, 46 Wis. 216; *State ex rel.* v. *Bankers' etc. Association*, 23 Kan. 500; *State ex rel. Harris* v. *Laughlin*, 75 Mo. 367; *Gatling* v.

*Lane,* 17 Neb. 81; *State* v. *Lancaster Co.,* 17 Neb. 85; *Miller* v. *Hueford,* 14 Neb. 81; *People ex rel. Little* v. *Wilsea,* 60 N. Y. 507; *State ex rel. Attorney-General* v. *Mead,* 71 Mo. 268.

It must be confessed that in the Missouri case and in the Kansas cases last referred to, the courts use some unguarded expressions not required by the cases before them.

On the whole, I think the clear weight of authority, and certainly sound reason, is against the position that a reference to a section in the title of an amendatory act without more is in any case sufficient.

For a valuable collection of cases on this subject, see Mr. Freeman's notes to *Davis* v. *State,* 61 Am. Dec. 331. By reference to the cases there cited, it will be seen that provisions such as that in our organic act are mandatory, and must be obeyed.

I give full assent to the doctrine that courts should hesitate before declaring an act of the legislature invalid; but while this is so, it is equally true that courts must give effect to views of law clearly entertained and necessary to the determination of causes; and this, even to the extent of declaring laws that are so unconstitutional. My conclusions concerning the validity of this law have not been hastily arrived at. Argument concerning a law similarly circumstanced was had before me in my district several months ago, and I deferred a decision of the question until after the holding of this term, partly in the hope that the question might be presented here and authoritatively determined. My associates have also had the benefit of argument in their districts, and have expressed opinions thereon before coming here. So that we are all as well equipped to arrive at a correct opinion as we can well hope to be, and as this question arises in this case and meets us squarely, it ought to be decided.

If the law conferring the elective franchise on females was not a fruit of disobedience to the wise and salutary

restraint of the Organic Act, as has been charged, and if there is a public sentiment in the territory which favors such a measure, the next legislature will probably re-enact it.   It will be done then, if done at all, openly and in a guise which is not objectionable, and after a full opportunity has been given the people to express their views. A measure of such a character, involving changes in our social and political structures so momentous, and as many men and women believe, so disastrous unless the measure lapse into disuse, ought never to be urged or passed under any other conditions.

For the reasons hereinbefore stated, I believe the act amending section 3050 to be in conflict with our Organic Act, and void.   For the same reasons the act of the legislature approved January 29, 1886, Statutes 1885–86, page 113, is void.   For the same reasons the act approved February 3, 1886, Session Laws 1885–86, page 128, is void except in so far as it purports to amend sections 3079 and 3084 of the Code.   These sections, relating as they do to the mere *minutiæ* of conducting elections, could not, under the title affixed to that act, be amended so as to confer the elective franchise on any one, nor has any amendment of them been attempted which would have that effect if valid.

Females, then, are not voters in this territory, and not being voters, they are not competent to sit on juries.

I do not believe that there is error in the record other than that committed in the ruling on the question which I have been considering; for that error, however, concerning which a majority of us are agreed, the judgment of the lower court must be reversed, and the cause remanded for further proceedings.

NOTE.— Since writing and delivering the above opinion, I have found the case in 27 Arkansas mentioned. That case relates entirely to a declaration of the Code of the state, to the effect that none of its provisions shall be

repealed unless such intention is expressly stated, etc.; no constitutional question was involved.

LANGFORD, J. (concurring).   The record in this case presents for our discussion the following propositions of law: —

1. Can a prisoner be extradited upon a charge of felony, which is the carrying on a swindling game of bunko and twenty-one, and be tried and convicted upon the charge of carrying on the game of twenty-one, or top-and-bottom dice, and swindling a man thereat?

2. Can a man be convicted of a felony under an indictment which charges that defendant and another conducted the swindling game of twenty-one, or top-and-bottom dice, without description of the offense by any words other than those naming a game stating no acts which constitute the offense?

3. Can a prisoner be convicted of any felony under such a charge in the indictment?

4. If the jury in such a case bring in a verdict of guilty *as charged,* can the court enter judgment for carrying on the swindling game of top-and-bottom dice, omitting the words "twenty-one"?

5. Can a prisoner be convicted on any indictment where he has duly challenged the grand jurors upon the admitted fact that four of them who found the bill were *married women,* living and keeping house with their husbands?

As to the first point, we think that each of the states are sovereign as to each other, in all respects, as one foreign nation is to another, save and except in those particulars which each state has surrendered to the United States.

Each state has surrendered its right to make treaties and war to the government of the United States.

If a prisoner is extradited from one state to another, it is done, not through the terms of treaty, the breach

of which is to be punished by war or revolution, but through the comity and pleasure of each state. There can be no power of one state brought against another to force extradition.

This comity of states is exercised with great liberality, and without the jealousy which controls foreign nations as to each other. This comity, by long custom, has become a *quasi international law* as between the states.

The courts of a state will not discharge a prisoner thus extradited except upon the ground of fraud or imposition.

A false pretense that a man is required for one thing, when in truth and in fact he is wanted for quite another thing, is a fraud, and in such a case the court would presume that the executive had been imposed upon, and upon an advantage being attempted as the fruit of such fraud, would discharge the prisoner.

In this case the offense mentioned in the requisition and the indictment are so similar that no presumption of fraud can arise. I conclude, therefore, that the prisoner ought not to have been discharged upon this ground.

As to the second point: the statute under which the prisoner was convicted divides illegal games into two classes, the first class being misdemeanors, the second felonies.

Among the class of games which are mentioned by name as misdemeanors is the game of twenty-one.

The game of twenty-one is not mentioned among those games which are declared felonies.

Top-and-bottom dice is not mentioned as a game which is either a misdemeanor or a felony.

If the game of twenty-one is to be punishable at all, it being specially mentioned as a misdemeanor, and not a felony, can only be punished as a misdemeanor, and a conviction of felony is illegal.

The offense is not defined by the statute except by the name of the game. What acts constitute the offense are

not stated in the statute. I am of the opinion that, when a word has an accepted unambiguous meaning as fixed by the law or by the English language, it is sufficiently definitive of itself without further statutory definition, such as the word "adultery," or the like; but a word which does not convey a fixed or ascertainable meaning in law or in English is not sufficiently definitive to create a crime. A law is a rule of action *prescribed.* A word which has no fixed meaning cannot constitute a rule of action, for the connotation is not definite, nor does it *prescribe,* either to the public or the courts, what acts are or are not criminal. The words "top-and-bottom dice" signify no class of actions which can be known by the public or the courts; besides, that game is not denominated an offense. What neither the courts nor the people can understand was probably not understood by the legislature, and though it intended to use the words, it had no definite idea of their exact meaning.

It requires certain particular acts to constitute a crime. The words used in this statute in no way inform us of what class of acts there are which constitute "top-and-bottom dice," nor "twenty-one." It may or may not be possible that some scientist in gaming might for a proper remuneration interpret the meaning of these words, and what acts it takes to amount to what the words denote. Such evidence, however, might not be reliable, and certainly no provision is made for an interpreter of foreign or slang words; courts cannot take judicial knowledge of the meaning thereof.

For these reasons, the prisoner could not have been legally convicted of an offense under an indictment which charges in such indefinite terms.

3. For the reasons above stated, the indictment does not, as the statute requires, set forth the facts constituting the offense. In truth, it sets forth no special acts

at all. It does not then set forth facts constituting an offense, and hence cannot sustain a conviction.

4. The jury returned a verdict of guilty of carrying on the swindling game of "twenty-one, or top-and-bottom dice." The words "twenty-one" may qualify the words "top-and-bottom dice," or the reverse may be true. The judgment of "guilty" for "top-and-bottom dice" only, though not agreeing with the indictment or verdict, may or may not mean the same thing. This shows, however, that it is a seeming attempt to escape from the words "twenty-one," which would only amount to a misdemeanor. If the two terms mean the same thing, then the judgment indicates that the misdemeanor is to be punished as a felony.

This but shows that the prosecutor and court were as ignorant as myself as to the acts which would constitute "twenty-one," or "top-and-bottom dice." They were uncertain whether the two terms meant the same acts or a different set of acts. All that can be gathered with any certainty is that the prisoner is guilty of some swindling game by which he cheated a person out of money. By what process this swindle was effected is unknown. There are swindles and cheats at common law which are indictable, and the class is well-known, and the facts constituting the offense may be set out in an indictment, but this is not done in this case.

5. Is a married woman living with her husband a competent grand juror? If she is both an elector and householder, then she is competent. If she lacks either qualification, then she is not.

First, then, is she an elector? It is admitted that she is not an elector unless she is made so by the act of 1883, page 40. This act has no title unless the words and figures following are one, to wit: "An act to amend section 3050 of chapter 380 of the Code of Washington."

We have a book which is marked on the fly-leaf, "The Code of Washington." I have examined it, and

find that upon its face it does not purport to contain any authenticated act of the legislative assembly of the territory of Washington. It purports to have been edited and compiled by a private party. It contains no titles to acts, no enacting clause, no signature of president of the council, speaker of the house, or governor. It is not certified by the secretary to be or contain a true copy of any legislative act. The chapters, divisions, and sections all purport to be the act of a private party. His sections run up to 3327, and in the book is an unauthenticated provision that a certain private party shall publish parts of a certain class of laws which he shall deem to be general, and leave out certain parts of all acts, and leave out entirely others. He certifies that he has examined all the laws embraced in the volume (the Code), etc., and put redundant matter in parentheses, and matters omitted from enrolled laws but supplied by him are inclosed in brackets.

Now, it is clear that this book contains no act passed by the legislative assembly, and it cannot be known officially what it does or does not contain. We suppose that it is this private book that the act of 1883 purports to amend.

Acts of a legislature may amend other acts of its own. An act cannot amend the statutes of the United States or of another state, or the works of a private author.

Such an attempt is simply void, and beyond the legislative power. The organic law of the territory provides that "every act of the legislature shall contain but one object, and that shall be expressed in its title."

If one part of this provision is not complied with, it is admitted an act is void. An act with or without a title might contain one or more than one object equally well.

That there shall be a title to such act, and that the title shall express the object, is entirely distinct from there being but one object in a bill. The last provis-

ion is not peculiar to our territory, but is in the organic laws of many of the states.

Its purpose and object have been decided by many courts. It is stated in late elementary authors. These authorities agree as to the purpose of this organic provision.

The evil it was intended to remedy was this: legislators had departed from the good old custom of having a preamble to each act reciting at some length the general purpose and object of the act which followed. They had departed also from another good old custom of having such bill read at length in the hearing of all the members before they voted upon it.

It had become the fashion to pass acts by merely reading the title. Now, as members only heard the title, it was of the utmost importance that the title should give upon its face the general scope of the proposed act, so that each member might have notice of what measure was before the house for his action.

It was also the fashion of newspapers to publish proposed acts by their titles only. To obtain the surreptitious passage of laws (which if these objects were known would be defeated), titles which gave no notice of what the acts contained were used to pass provisions unknown to the legislature.

This fraudulent practice became a public evil of so great a magnitude that constitutional provisions were made to prohibit the practice. It was thus provided that no act should be passed without having a title which expressed its object. So that when a bill was read or published by title only, the title alone could give notice of the general scope of the act.

There would be no use of a title that of itself did not give this notice within itself, for it alone was read. The expression of the object was to give notice of the contents.

The words of a title were in the nature of things brief.

Much controversy has arisen as to whether the words of the title were broad enough to cover all the provisions of the act, or definite enough to give notice of the contents.

No case has arisen in the courts, nor been commented upon by authors, where the violation of the provision has been so gross as in this case, except it may be a case in the state of New York, and perhaps in another state.

The title of this act does not attempt to give notice of what the act itself contains, or what is the object of it, or what is its subject-matter.

It attempts to make a reference to certain sections of a certain book where the object may be discovered.

By reading the title nothing is known, but by reading the title and then reading the book, a member may find out the object. If this were all that was intended, then a title like this would be better: "An act to provide for certain things which will be found in the body thereof." This reference would be better, because easier made, for here the reference would be to an act directly under the reference, while by the other it would be much more difficult to find the matter referred to. It is more important that constitutional provisions should be observed than any temporary inconvenience may be suffered, which may be remedied by the next legislature. The act is then void because it has no title expressing its object. The act of 1886 is invalid for the same reason, and hence women are not electors nor qualified grand jurors.

*Are married women living with their husbands householders?* A woman who keeps house and controls it, as a widow, or the like, may be a householder. The term has been defined in exemption laws and jury laws frequently, as only including the husband, and not the wife, when they live together as husband and wife. No doubt but that this meaning obtained for the reason that the husband was deemed to have control of the house, his

wife, and his family. It has ever been used in the statutes of this territory and many others as distinguishing the husband only. There has been no act passed purporting by its title to amend the old section which had the uniform construction that the husband alone is included. If this section has been modified, it has not been done by any act which by its title or otherwise referred to the subject-matter of the qualification of jurors.

Had the legislature intended to change the qualification of jurors it would seem that they would have signified that intent by amending the act relating to the subject. This they have not done. If it has been changed, it has been done without any expression of a legislative intent to change it. It has been done incidentally without any reference to the quality of grand jurors.

The incidental acts which have been thought by some to change the old law, that the man is the only head of the family, and make two heads instead of one, are the "married women" acts, so called.

These acts have existed in nearly their present form since 1869, and no one imagined that the personal relations of husband and wife were changed. It was thought the "married women" acts only related to rights of the women to hold and control property, and the like, and nothing more.

The act which is claimed to change the qualification of jurors, passed November 14, 1879, was entitled "An act to establish and protect the rights of married women." This act has been passed in many other states, and last in the state of Oregon, yet in none has it been construed to make the married women the head of the household, or qualify her to sit on juries.

Even here, where certain property is exempted to each householder, it has not been claimed that the husband as one householder and the wife as another can each and both claim the exemption, and thus double the exemption.

Civil disabilities are abolished as to the wife, but if the right to vote is a civil right, it was not abolished by this act. The words "civil disabilities" are explained by the context.

For any "usurpation of her natural or property rights she may appeal to the courts," etc. It was simply intended to give her a *status* in court to protect her civil rights, i. e., her natural or property rights.

Section 2 makes special provision as to control and custody of children, showing that it was not thought that the words "civil disabilities" being removed, and she being permitted to sue for her natural and property rights, included the right to control children.

If, notwithstanding the civil-disability clause and the natural and property right clause, it was necessary to add another section concerning children, it clearly shows that the legislature thought they intended to give women the equal right to hold property, control children, and the right to sue which her husband had, and nothing more.

No more than this is expressed in the language; not a word about her being lord of the household, or juror, or the like.

If the legislature was so particular to name natural and property rights and right to control children, it is to be presumed that these subjects only were intended to be legislated upon.

Is every man who is disqualified from being a grand juror laboring under a civil disability? If this is so, attorneys, postmasters, physicians, old men, even the judges, are now suffering from civil disability. Read, "A wife shall not be deprived of civil rights," and you have an equivalent expression to this statute. Jury duty, militia duty, labor on the road duty, etc., were surely never intended to be imposed on her. Perhaps it may be said that she has a right to trial by her peers, and that men are not her peers. This thought never

occurred until lately, as women on trial have never challenged jurors on that ground.

The evil which the legislature intended to remove was the abuse, and imprisonment, and robbery of women by bad husbands. The object was good, and I am sorry to know that no law can effect much in this matter. It will do some good, however. There never can be much effective application of law which will make a bad husband a good one.

For the reasons above stated, I am of the opinion that the law as to qualifications of grand jurors is unchanged, and that it was error not to have allowed the challenge of the prisoner, and the cause ought to be reversed and the prisoner discharged.

GREENE, C. J. (dissenting).—From all that is decisive, and from much that is not decisive, in the very able opinions just read by Messrs. Justices TURNER and LANGFORD, I totally dissent, and will in due time, if circumstances admit, file a dissenting opinion.

NOTE BY REPORTER. — The case decided by the Supreme Court of Wisconsin, and referred to by Mr. Justice Turner in his opinion in the foregoing case (see p. 142, *ante*), is *In re Lavinia Goodell*, 39 Wis. 232, involving the right of a woman to be admitted to practice as an attorney. The following is an extract from the opinion of Mr. Justice Ryan, speaking for the Supreme Court in deciding that case, and which relates to some of the questions discussed by Mr. Justice Turner in his opinion: —

"So we find no statutory authority for the admission of females to the bar of any court of this state. And with all the respect and sympathy for this lady which all men owe to all good women, we cannot regret that we do not. We cannot but think the common law wise in excluding women from the profession of the law. The profession enters largely into the well-being of society; and to be honorably filled and safely to society exacts the devotion of life. The law of nature destines and qualifies the female sex for the bearing and nurture of the children of our race, and for the custody of the homes of the world and their maintenance in love and honor. And all life-long callings of women, inconsistent with these radical and sacred duties of their sex, as is the profession of the law, are departures from the order of nature; and when voluntary, treason against it. The cruel chances of life sometimes baffle both sexes, and may leave women free from the peculiar duties of their sex. These may need employment, and should be welcome to any not derogatory to their sex and its proprieties, or incosistent with the good order

of society.  But it is public policy to provide for the sex, not for its super-fluous members, and not to tempt women from the proper duties of their sex by opening to them duties peculiar to ours.  There are many employments in life not unfit for female character.  The profession of the law is surely not one of these.  The peculiar qualities of womanhood, its gentle graces, its quick sensibility, its tender susceptibility, its purity, its delicacy, its emotional impulses, its subordination of hard reason to sympathetic feeling, are surely not qualifications for forensic strife.  Nature has tempered woman as little for the juridical conflicts of the court-room as for the physical conflicts of the battle-field.  Womanhood is molded for gentler and better things.  And it is not the saints of the world who chiefly give employment to our profession.  It has essentially and habitually to do with all that is selfish and malicious, knavish and criminal, coarse and brutal, repulsive and obscene, in human life.  It would be revolting to all female sense of the innocence and sanctity of their sex, shocking to man's reverence for womanhood and faith in woman, on which hinge all the better affections and humanities of life, that woman should be permitted to mix professionally in all the nastiness of the world which finds its way into courts of justice, — all the unclean issues, all the collateral questions of sodomy, incest, rape, seduction, fornication, adultery, pregnancy, bastardy, legitimacy, prostitution, lascivious cohabitation, abortion, infanticide, obscene publications, libel and slander of sex, impotence, divorce; all the nameless catalogue of indecencies, *la chronique scandaleuse* of all the vices and all the infirmities of all society, with which the profession has to deal, and which go towards filling judicial reports which must be read for accurate knowledge of the law.  This is bad enough for men.  We hold in too high reverence the sex without which, as is truly and beautifully written, *le commencement de la vie est sans secours, le milieu sans plaisir, et le fin sans consolation,* voluntarily to commit it to such studies and such occupations.  *Non tali auxilio nec defensoribus istis,* should juridical contests be upheld.  Reverence for all womanhood would suffer in the public spectacle of women so instructed and so engaged.  This motion gives appropriate evidence of this truth.  No modest woman could read without pain and self-abasement, no woman could so overcome the instincts of sex, as publicly to discuss the case which we had occasion to cite *supra, King* v. *Wiseman.*  And when counsel was arguing for this lady that the word   person, in section 32, chapter 119, necessarily includes females, her presence made it impossible to suggest to him, as *reductio ad absurdum* of his position, that the same construction of the same word in section 1, chapter 37, would subject woman to prosecution for the paternity of a bastard, and in sections 39 and 40, chapter 164, to prosecution for rape.  Discussions arc habitually necessary in courts of justices which are unfit for female ears.  The habitual presence of women at these would tend to relax the public sense of decency and propriety.  If, as counsel threatened, these things are to come, we will take no voluntary part in bringing them about.

" The motion is denied."