[No. 9399. *En Banc.* March 15, 1911.]

E. F. Blaine et al., *Respondents*, v. The City of Seattle et al., *Appellants.*[1]

Municipal Corporations—Indebtedness—Bonds—Submission to Voters—Distinct Propositions. Under const. art. 8, § 6, providing that no city shall become indebted in excess of one and one-half per cent of the taxable property without the assent of three-fifths of the voters therein voting at an election held for that purpose, a city cannot submit to the voters a bond issue to raise money for several distinct purposes, in no way related to each other, in such a way that the voters must vote for or against all the propositions; "assent" meaning that the voters shall freely express their approval of each of the various objects sought.

Appeal from a judgment of the superior court for King county, Tallman, J., entered February 15, 1911, in favor of the plaintiffs, upon overruling a demurrer to the complaint, enjoining the issuance and sale of municipal bonds. Affirmed.

*Scott Calhoun* and *Bruce C. Shorts,* for appellants.

*P. C. Sullivan* and *Peters & Powell,* for respondents.

Morris, J.—Respondents brought this action as taxpayers to enjoin the city of Seattle and its officers from the issuance and sale of certain municipal bonds, authorized at an election held March 8, 1910. The defendants entered a general demurrer to the complaint, which was overruled and judgment

[1]Reported in 114 Pac. 164.

as prayed for entered; whereupon the city appeals. The facts involved upon which the questions of law are predicated will be gathered from the opinion without any further or more specific statement. The election was had pursuant to an ordinance submitting to the vote of the people a proposition to issue bonds for eight several and distinct purposes, aggregating in amount $421,000. These separate purposes, and the amount involved in each purpose, were apportioned as follows: $57,500 for sites for fire houses; $50,000 for site for city stables; $173,500 for the construction of fire houses; $5,000 for a combined fire house and dock; $10,000 for a police sub-station; $25,000 for an isolation hospital; $50,000 for a bridge on Spokane avenue; $50,000 for a bridge on Westlake avenue. These eight distinct propositions were, by the ordinance, submitted in such a manner that the voter was compelled to vote for or against all of them. This manner of submission to the voter raises the only question involved on the appeal.

It is conceded that the issuance of these bonds would make the indebtedness of the city exceed the limitation fixed in art. 8, § 6 of the constitution, providing, so far as is here applicable, that no municipal corporation shall for any purpose become indebted to an amount exceeding one and one-half per centum of the taxable property, without the assent of three-fifths of the voters therein, voting at an election to be held for that purpose. The city of Seattle, as a city of the first class, is by general law given power to borrow money for corporate purposes in such manner as shall be prescribed in its charter, and may borrow money or contract indebtedness for municipal purposes exceeding one and one-half per centum of its taxable property, with the assent of three-fifths of the voters at an election held for that purpose and in the manner presented by the city council, not inconsistent with the general election law. The charter of the city provides for the issue of bonds for corporate purposes in the manner prescribed in its charter and the constitution and laws of the

state. Another section provides for the submission of any intended indebtedness to the voters in the mode and manner prescribed by ordinance. Another section provides that every ordinance shall contain but one object. These are the only provisions that have any bearing upon the question before us.

It will be noted that, while the power to create a municipal indebtedness within the constitutional limitation is conferred upon the city, both by general law and its charter, and while the city may by ordinance determine the manner of submitting any proposition seeking to incur such indebtedness to the voters, the ordinance providing for such submission to the voters, and the mode and manner adopted by the city council in submitting such proposition, shall not be inconsistent with the constitution and laws of this state. If, then, the method adopted in this instance of submitting these eight propositions to the voter and compelling him to assent to or dissent from each and all of them or lose his vote is inconsistent with the constitution and laws of the state, it must fail. The constitutional inhibition as to such indebtedness as is here sought to be created is that no city shall for any purpose become so indebted in any manner, without the assent of three-fifths of the voters, voting at an election held for that purpose. What is the meaning of this provision, if not that no city, whatever its purpose may be, however needful or meritorious may be the object, however necessary to the safety, good health, or general welfare of its citizens, may not incur an indebtedness beyond the one and one-half per cent of its taxable property, unless three-fifths of the voters shall assent? What is the public policy created by such a provision, if not that the voter shall freely, voluntarily, and with a full knowledge of the purpose of the election and the object to be attained thereby, consent to the laying of this additional burden of taxation upon his property? The assent of the voter here means more than his affirmative vote; it was intended to mean a vote cast with his approval of the object sought. "Assent"

means that the election shall be held in such a way as to obtain a free and intelligent expression of the voters' approval or disapproval upon the object of the contemplated indebtedness. It is the evident and manifest purpose of this provision that no indebtedness shall be created except its purpose meets with the free assent and approval of three-fifths of the voters who may desire to express their views upon the object sought, and any election held for the purpose of creating such an additional municipal indebtedness is not an election within the meaning of this constitutional provision, when it is held under such restrictions as to prevent the voter from casting his individual and intelligent vote upon the object or objects sought to be attained. *Woodlawn v. Cain,* 135 Ala. 369, 33 South. 149.

How can a voter express his free and intelligent assent to such an additional burden of taxation when, in order to so express it, he is compelled to express a like assent to other measures, with which he is not in sympathy nor accord, and against which, if given the opportunity, he would cast his vote. Here we have eight separate and distinct propositions upon which as a whole the voter must assent or dissent. Some he favors, others he is opposed to; and yet, in order to express his assent upon those he favors, and which in his judgment are needful for the city's growth and prosperity, he must likewise express, not an intelligent nor free, but a controlled and compelled assent to measures he deems harmful. As is said in the case cited, "to declare an election of this kind valid would be to take from the people the right and power to control in this matter of additional taxation and vest it exclusively, practically, in those charged with the duty of calling the election, for they could defeat any measure, however beneficial and popular, by coupling with it a proposition ruinous and altogether objectionable, and they could secure many undesirable and vicious measures by coupling with them others necessary to the welfare of the community." For these reasons, an election was there held void where two propo-

sitions were submitted and the voters compelled to vote upon
the propositions as a whole. The constitutional provision,
that the purposes of the tax shall be stated in the election call,
was held to be violated. This is not as strong a provision as
that contained in our constitution, coupled with the charter
provision that the election shall be had only after thirty days'
notice of its purpose; but that, following the constitution, it
must receive the assent of three-fifths of the voters, the latter
requirement being an additional safeguard to that referred to
in the case cited.

The vice of this method adopted by the city to compel an
affirmative vote on all eight measures is readily apparent upon
an examination of the propositions submitted, propositions
in which there is nothing in common, nor any such unity of
interest as would lead any one to either favor or disfavor all
eight measures. Illustrating this view is the proposition for
the two bridges. One calls for a bridge over the west water-
way at Spokane avenue in the south part of the city, a
matter in which the people of West Seattle and those interested
in the waterways to the south are particularly interested,
and which they deem of great value in the opening up of the
Duwamish waterway scheme. The other calls for a bridge
over the government canal at Westlake avenue in the north-
ern part of the city, a project in which the people along the
north end of Lake Union and the advocates of the govern-
ment canal are deeply interested. There is nothing in com-
mon between these two propositions. One is a scheme for
the development of the city to the north; the other a scheme
for its development to the south. The people in these widely
separated districts have no common interest in any local im-
provement. In fact, their interests from a selfish point, are
as diversified and separate as the measures themselves; and
yet these people, in order to get an improvement which they
consider of great value and importance to their section of the
city, must support another improvement in which they have

15—62 Wash.

no interest. Neither can they have their bridge unless they take city stables, a sub-police station, an isolation hospital, and other as dissimilar projects with it. What sense of fairness developed such a scheme? If one were left to surmise, it might be that the popularity of the bridge projects and the enthusiasm developed by the people of the north and south ends of the city were depended upon to carry through other measures tied up with them which otherwise might have met with poor success. If you want the bridge you must vote for the sub-police station, may be a good political scheme to obtain a favorable vote; but does not appeal very strongly to a public policy which declares that the right of franchise shall be exercised freely, intelligently, and without let or hindrance, save the conscience of the voter and his honest belief in what is needful for the best interest and general welfare of the community. That such is the public policy of this state in all exercise of the elective franchise is demonstrated in the adoption of the Australian ballot system and the primary election laws, the purpose of which is to give to the voter individual action and to remove him as far as possible from any influence that would shape or control his ballot, and permit him to exercise freely and voluntarily his right of selection, whether it be for men or for measures. Any scheme, however framed, which curtails or abridges this right must yield to the wise public policy which has created it.

The charter provision providing that "the mode and manner of submitting such proposition to the voters shall be prescribed by ordinance," does not confer upon the city council the authority to adopt a scheme which contravenes and destroys the safeguards which the constitution and public policy of the state, as announced in the constitution and general laws, have thrown around the voter, to guard and protect the purity of the ballot and to preserve inviolate, in so far as the law can, the freedom of individual choice. Neither do we have to find an express constitutional provision that declares that such a submission as here made is forbidden,

in order to hold such a method of submission illegal. The constitution has a spirit as well at a letter, and in determining questions of public policy, that which violates the spirit of the constitution is as vicious as that which falls within its express prohibition. And, as is said in *Stern v. City of Fargo* (N. D.), 122 N. W. 403, if there is any conflict of authority upon this question, "we feel at liberty to adopt that rule based upon those principles which to us appear most nearly in consonance with the statute, the spirit of our institutions, and which will best protect the voter in the exercise of his franchise and the municipality against possible fraud:" the question in that case being the submission of a proposition to issue $100,000 in bonds for the construction of a waterworks pumping station and an electric light plant in connection therewith as one proposition. The court, as before intimated, admitting an apparent conflict of authority upon such a manner of submission, says—and this is peculiarly applicable to the situation here—"the authorities are nearly unanimous to the effect that a proceeding by which two questions are submitted when such questions on their subjects and purposes are not naturally related or connected, is invalid and renders any election at which such questions have been submitted invalid;" citing a large number of authorities. The ordinance calling the election in that case noted its purpose as a proposition to issue the $100,000 for the construction of the two plants without any segregation, and the law reviewed was a statute requiring notice to be given of the purpose for which it was proposed to issue bonds and a constitutional provision prohibiting the diversion of money raised by taxation for any purpose to any other purpose.

A few other authorities will be referred to. In *Gray v. Mount*, 45 Iowa 591, it is said, in dealing with a similar question:

"If there be two objects and a specified amount of funds to be devoted to each, it is plain that there are two propositions submitted at the same election. If they are submitted to-

gether, it is very clear that the voter cannot vote for one and against the other. He must vote against both, whereby he may defeat one, the success of which he desires, or he must vote for both, whereby he may cause the success of one which he desires to be defeated. If he fails to vote he may thus aid in causing the defeat of his favorite measure, and the adoption of the one he opposes. He has thus no liberty of choice . . . . The very letter as well as the spirit of our election laws condemns this plan."

Mr. Justice Brewer, in *Lewis v. Commissioners of Bourbon County*, 12 Kan. 186, at page 214, in discussing such a double submission, adds his disapproval in saying:

"It needs no argument to show the rank injustice of such a mode of submission. By it several interests may be combined, and the real will of the people overslaughed. By this combination an unpopular measure may be tacked on to one that is popular and carried through on the strength of the latter. A necessary matter may be made to carry with it some private speculation for the benefit of the few. Things odious and wrong in themselves may receive the popular approval, because linked with propositions whose immediate consummation is deemed essential. It is against the very spirit of popular election. That aims to secure freedom of choice, not merely between parties, but also in respect to every office to be filled, and every measure to be determined."

Like reasoning is employed by the courts in many cases to which we cannot refer without unnecessarily extending this opinion. Among such cases are *Rea v. La Fayette*, 130 Ga. 771, 61 S. E. 707; *Supervisors of Fulton County v. Mississippi & W. R. R. Co.*, 21 Ill. 338, 373; *City of Denver v. Hayes*, 28 Colo. 110, 63 Pac. 311; *City of Leavenworth v. Wilson*, 69 Kan. 74, 76 Pac. 400; *Cain v. Smith*, 117 Ga. 902, 44 S. E. 5; *State ex rel. Bethany v. Allen*, 186 Mo. 673, 85 S. W. 531; *Garrigues v. Commissioners*, 39 Ind. 66, and a large list of others collated in *Stern v. Fargo, supra*.

Counsel for the city contend that this court has approved this method of submitting like propositions in *Metcalfe v. Seattle*, 1 Wash. 297, 29 Pac. 1010; *Yesler v. Seattle*, 1

Wash. 308, 25 Pac. 1014, and *Seymour v. Tacoma*, 6 Wash. 138, 32 Pac. 1077. We do not so read those cases. The *Metcalfe* and *Yesler* cases involved the same bond issue, providing for waterworks and sewers. The question here raised was neither submitted to nor discussed by the court; the only question involved being whether an ordinance providing for waterworks and sewers violated the act of 1886, providing no ordinance shall contain more than one subject. It was held that the ordinance was double in its nature, but that this was permissible under the act of 1890 which repealed the act of 1886 in this regard, in providing that:

"Whenever the city council . . . shall deem it advisable that the city . . . shall exercise the authority hereby conferred upon them in relation to either or both such waterworks or system of sewerage or plants or works for lighting purpose, the corporation shall provide therefor by ordinance."

This statute, it was held, clearly authorized an ordinance providing for both waterworks and sewers. In the *Seymour* case the court had before it the validity of an election under an ordinance providing for the issuance of bonds for the purchase of waterworks and an electric light plant, submitted as one proposition, and it was held that, under the act of 1890 referred to in the *Yesler* case, the two questions might be submitted as one proposition; the attack being made, not on the form of the submission, but that the power conferred by the act of 1890 as amended by the act of 1891 was a power to construct and not a power to purchase, and that the ordinance failed to specify the works and plant with sufficient detail to enable the voter to determine the expediency of purchasing the property at the price named; and other like attacks in no way analogous to the question here submitted. An examination of the *Metcalfe, Yesler,* and *Seymour* cases discloses that the same member of this court wrote all three opinions, the last one being filed June 2, 1893. On July 25, 1893, the same judge filed an opinion in the case of *McBryde v. Montesano*, 7 Wash. 69, 34 Pac. 559, which case

was appealed to this court prior to the appeal in the *Seymour* case, and was pending for decision at the time of the decision in the *Seymour* case.   The question submitted in the *McBryde* case was, whether a proposition to borrow money to fund old debts and a proposition to borrow money for future munici-pal indebtedness might be submitted at the same election; and it was held that it could, but that it could not be united with the proposition to borrow money for future purposes so as to have one expression of the voter answer both proposi-tions.   "They might be decided by the same ballot, but the voter must have an opportunity to express himself separately as to each one."   That the court had in mind its opinion in the *Seymour* case is evidenced by the fact that such case is expressly referred to and held to have no application.   It cannot be said, therefore, that the *Seymour* case is authority for the uniting of several propositions in one submission and calling for one assenting or dissenting vote upon all, in the face of the language used in the *McBryde* case, which is strongly assertive that it cannot be done, and is in accordance with the views heretofore expressed in this opinion.   That Judge Stiles had these same views in mind at the time he wrote the opinions in the *Metcalfe* and *Yesler* cases is evident from this language used by him in the *Metcalfe* case:

"Clearly the intention was, that whereas such works are likely to demand large and unusual expenditures, the wisdom of which, in some cases, may be doubtful, the people who would have to furnish the means should be fully apprised of the whole scheme, and that there should be a definite, well con-sidered, and practicable scheme presented for their rejection or adoption."

These views are in support of, rather than antagonistic to, the position we have taken.

For these reasons, we believe the scheme adopted by the city of Seattle to submit these eight propositions as one is in violation of the public policy announced in our constitu-

tion, laws, and judicial announcements, and is therefore illegal.

The judgment is affirmed.

DUNBAR, C. J., CHADWICK, MOUNT, PARKER, and CROW, JJ., concur.