[Civil No. 3937.   Filed March 14, 1938.]

[77 Pac. (2d) 215.]

STATE OF ARIZONA ex Rel. JOHN L. SULLI-
VAN, Attorney General, Appellant, v. W. J.
BURNS, W. S. STEVENS, C. O. VOSBURGH,
as Members of and Constituting the BOARD OF
DIRECTORS OF ROOSEVELT IRRIGATION
DISTRICT, Appellees.

Mr. Joe Conway, Attorney General of Arizona, Mr. A. R. Lynch and Mr. Jack Choisser, his Assistants, for Appellant.

Messrs. Armstrong, Kramer, Morrison, Roche & Duffy, for Appellees.

LOCKWOOD, J.—This is an action by the State of Arizona, hereinafter called plaintiff, asking for a writ of *mandamus* compelling W. J. Burns, W. S. Stevens, C. O. Vosburgh, as members of and constituting the board of directors of Roosevelt Irrigation District, hereinafter called defendants, to make a tax levy upon the lands of the district, which plaintiff claims it is the duty of defendants to make by the provisions of section 4, chapter 102, of the Session Laws of 1929. Judgment was rendered for defendants, and plaintiff has appealed.

The facts of the case are not in dispute, and may be stated as follows: The Roosevelt Irrigation District was organized in 1923 under the laws of Arizona relating to irrigation districts, and embraces approximately, 41,000 acres within its boundaries. It is supplied with water by means of pumps, and does not make use of a dam or storage reservoir in connection

with its operations. During the year 1927 it issued and sold its serial bonds in the aggregate amount of $3,065,000, which bonds were approved by the State Certification Board of Arizona, hereinafter called the board, and certified by the state auditor, under the provisions of chapter 149 of the Session Laws of 1921. The money received from the sale of such bonds was used for the construction of the irrigation system of the district. In 1931 and 1932 the district proposed to issue $600,000 worth of bonds additional to those already outstanding, and at that time the board approved their issuance after plans for the work which was to be done with the proceeds of the bonds had been submitted to the board by the district, and engineering determinations as to the feasibility of the work made by the state engineer. However, for various reasons these bonds were never sold. In 1934, the Eleventh Legislature, at its third special session, passed chapter 6, commonly called the District Enabling Act of 1934, which enabled irrigation districts, among other organizations, to make contracts with the federal government to secure loans and grants of money from that government, either for the purpose of making repairs or improvements to their property or works, or to refund or refinance their existing indebtedness. The district had arranged with the Reconstruction Finance Corporation of the United States, commonly called the RFC, to refinance its outstanding indebtedness by a loan, provided that it made a satisfactory agreement with its bondholders, and further provided that certain canals, which supplied the district with water, were lined with cement. In order to finance the work of lining the canals, the district also made application to the Public Works Administration, usually called the PWA, for a grant of $211,-000, and a loan of $545,000, which loan was to be covered by bonds purchased by the PWA under the

terms of the agreement. The district made application to the board for approval of its agreement with the PWA for the loan of $545,000 and grant of $211,-000, as aforesaid, asking that the board approve such agreement, and authorize and approve the issuance of the bonds provided therein. After due consideration, the board made its order reciting, among other things, that the installation of the cement lining to be paid for by the proceeds of the agreement with the PWA was highly necessary and beneficial for the district, and that such project and agreement were approved. Thereupon, satisfactory arrangements having been made with the bondholders, the RFC did agree to refinance the district's already existing bond indebtedness, a contract was let by the district for the lining of the canals, as aforesaid, and the work was begun and completed during the year 1936. The state engineer went upon the ground and inspected the relining of the canals from time to time, over the repeated protest and objection of the district. The board made demand on the district that it levy an assessment to pay the fees provided by section 4 of chapter 102, *supra,* to the state engineer, claiming that it was the duty of the district to do so by reason of the law and the facts. This the district refused to do, and this action was brought.

The sole question presented for our consideration is whether, under the facts, it was the duty of the district to make the levy as requested. This depends upon the construction of our statutes applying to such a situation, and we review them so far as necessary. In 1921, chapter 149 of the Regular Session Laws of that year provided for the organization of irrigation districts and their government, repealing various previous statutes covering the same subject. This chapter was subsequently carried forward into the Code of 1928. Among other things, it provided for the es-

tablishment of a state certification board, in the following language:

"§ 3416. *Creation of state certification board.* There is hereby created the state certification board of the state of Arizona, the members of said certification board to be the attorney general, the state engineer and the superintendent of banks; said certification board shall elect one of its members chairman, and one or more of such members of said certification board shall from time to time as may be required, designate from his or their regularly employed clerks and assistants such clerks and assistants as may be necessary, who shall perform without extra compensation the duties herein imposed."

Apparently the only circumstances under which the board could act at that time, and the limitations upon its action, are found in sections 3417, 3418, 3419, 3421, and 3422, which read, so far as material, as follows:

"§ 3417. *Resolution filed with certification board.* Whenever the board of directors of any irrigation district or water conservation district organized and existing under and pursuant to the laws of the state of Arizona shall by resolution declare that it deems it desirable that any contemplated or outstanding bonds of said district, including any of its bonds authorized but not sold, shall be made available for the purposes provided for in section 3422 of this article, the board of directors shall thereupon file a certified copy of such resolution with the said certification board."

"§ 3418. *Investigations and findings of certification board.* Such certification board upon the receipt of a certified copy of such resolution shall without delay make or cause to be made an investigation of the affairs of said district, and make written findings of the result of such investigation.

"The bonds of such district referred to in such resolution of the board of directors of the district shall be certified by the state auditor in the manner hereinafter provided, if such written findings of said certification board shall have found that the irrigation

system of the district and the specific project for which the said bonds under consideration are desired to be used or have been used, whether such project be constructed, projected or partially completed, are feasible. * * * ''

"§ 3419. *Consent of certification board; expenditures.* Whenever the bonds of any such district have been certified as provided in this article no expenditure of any kind shall be made from the proceeds thereof without the consent of the certification board provided for in this article, and no obligation shall be incurred, payable out of such proceeds without the previous authorization of said certification board.''

"§ 3421. *Expenses of board; how paid.* All necessary expenses incurred in making the investigations and findings in this article provided for shall be paid as the certification board may require by the district whose bonds and property have been investigated by the certification board, provided that the district whose property and bonds have been investigated shall have the benefit of any data that may have been obtained by said certification board.''

"§ 3422. *Bonds as legal investment.* All bonds certified in accordance with the terms of this article shall be legal investments for funds of savings banks within the state of Arizona, and may be deposited to secure public moneys in the state of Arizona; and hereafter no savings bank in the state of Arizona shall invest any of its funds in bonds of any such district not so certified, not shall any such bonds not so certified be available to secure public moneys.''

It will be seen upon an examination of these sections that the board was to act only when the board of directors of an irrigation district desired that its bonds should be made available as legal investments for savings banks within the state of Arizona, or as security for public moneys. If a district did not desire that its bonds should be used for either of these purposes, there was no requirement that it should in any manner consult the certification board. The obvious purpose was to insure to prospective pur-

chasers of the bonds that the state board had made an investigation of the irrigation project on which the bonds were based, and had concluded that it was feasible from an engineering and financial standpoint, and that the proceeds would be expended for the purposes of the project submitted to the board, so that its bonds were suitable for the purposes above set forth. Were this all the legislation upon the subject, it is apparent that the transactions involved in the present case did not come under the jurisdiction of the board in any manner; there having been no request that the bonds to be sold to the PWA be made available for savings banks or security for public funds.

In 1929, the Ninth Legislature adopted chapter 102 of the regular session. It is entitled as follows:

"An Act Providing for the Supervision and Regulation of Dams, Reservoirs and Appurtenances, and Electrical and Irrigation Districts Projects by the State Engineer; Defining His Powers and Duties and Fixing His Jurisdiction; Providing for the Enforcement of Said Supervision and Regulation; Fixing the Fees Hereunder and Creating a State Dam and Supervision Fund; Providing Penalties for Violation Hereof; and Repealing all Acts and Parts of Acts in Conflict Herewith."

Most of its provisions deal with the construction, operation, and maintenance of dams and works appurtenant thereto for the impounding or diversion of water, and very elaborate provisions are made in regard to the duties of the state engineer in supervising the construction of such works. There are, however, two provisions which are very general in their nature, and which cover much more than dams, storage reservoirs, or structures appurtenant thereto. They read as follows:

"Section 4. . . .
"Upon all projects for which approval is requested or to be requested of the state certification board of,

involving examination, supervision, and inspection by the state engineer, *whether in connection with the construction of a dam or otherwise,* the following fees shall be paid: For irrigation projects of whatsoever kind involving twenty-five thousand acres or less, an annual tax levy of ten cents per acre shall be levied and collected and when in excess of twenty-five thousand acres an annual tax levy of five cents per acre shall be levied and collected, both of which levies shall be for the years required in the construction of the respective project only, and shall be made in the same manner as provided for the levy to be made for the other expenses of the district, collected in the same manner and which fees shall be transmitted to the state treasurer and credited to the 'State Dam and Supervision Fund,' to be expended by the state engineer as provided herein from this fund.

"All fees collected by the state engineer under this section shall be paid to the state treasurer, who shall credit them to the special fund hereinbefore designated for the purpose provided herein. The fees herein provided shall be required of all applicants including the state and its departments, institutions, or agencies; and all other agents whatsoever without a single exemption." (Italics ours.)

"Section 14. All engineering determinations and supervision provided for and directed by any law heretofore enacted and any amendment or revision thereof or to be hereinafter enacted respecting irrigation districts or electrical districts shall be made under the direction of the state engineer and when so made shall be accepted by and binding upon the state water commissioner or the state certification board as the case may be.

"Upon the certification of any irrigation project or of any electrical district project the plans, specifications and contracts therefor, and any modification thereof thereafter made shall be filed with the state engineer and the works approved and authorized thereby shall be performed strictly in accordance with such plans, specifications and contracts and any such modification thereof. The state engineer shall enforce the provisions of this section by inspection and other

required act with the same power and duties as conferred upon him by this act in respect to dam construction and repair.''

The fees provided by section 4, *supra,* were to be paid ''upon all projects for which approval is requested or to be requested of the state certification board *of*, involving examination, supervision, and inspection by the state engineer.'' It will be noted that the word ''of'' follows the word ''board'' in the description of the projects upon which fees are to be paid. This is obviously a mistake, for on no' theory has it an intelligible meaning when used in the place in which it is found. In order to make this language intelligible, we must either substitute the word ''or'' or the word ''and'' for ''of,'' or we must omit the ''of'' entirely which, in effect, gives the phrase the same meaning as if we substitute ''and.'' The primary canon of construction of statutes is that we give the law the meaning which the legislature intended it to have, and this is true regardless of the strict rules of grammar. *Higgins' Estate* v. *Hubbs,* 31 Ariz. 252, 252 Pac. 515. And if it be necessary in order to make the statute intelligible, the court may, and should, correct palpable mistakes in writing, grammar, spelling, or punctuation. *Meyers* v. *Baker,* 120 Ill. 567, 12 N. E. 79, 60 Am. Rep. 580; 25 R. C. L. 975, and cases cited. It is apparent to us how the word ''of'' appears in the statute. The original acts of the legislature, signed by the Speaker of the House and President of the Senate, approved in writing by the Governor, and filed with the Secretary of State, are, in Arizona, in recent years at least, almost invariably typewritten. It is a matter of common knowledge that the keyboard of the standard typewriter is so arranged that it is very easy, by a mere slip of the finger, to write ''of'' when the operator is thinking of, and intends to write, the word ''or,'' while it is very improbable that ''of''

should be substituted for "and" in this manner. Further, we think that when we analyze and compare chapter 149, *supra,* with chapter 102, *supra,* it appears much more likely that the legislature intended to place "or" in the act rather than "and." By chapter 149 the board, when its certification was requested, was necessarily required, if it did its full duty, to make more or less extensive investigation of the engineering and financial phases of the project, for it was only if the district was a financial success that its bonds were good, and such success was vitally affected by the cost and character of its water system. In such investigation, therefore, it would almost always be necessary to use the services of skilled engineers. That such a type of investigation was expected by the legislature is shown by the provisions of section 3421, *supra,* which require the necessary expenses incurred in making the investigation and findings of the board to be paid by the district, which should have the benefit of any data that might have been obtained by the board in the course of such investigation. But the board was not then limited as to who should be chosen to make its investigations. In chapter 102, *supra,* however, there were certain onerous duties imposed upon the state engineer in regard to the construction of dams, regardless of whether the authorization of the bonds of the district by the board was asked or not, and if engineering services were required by the board, the state engineer was required to furnish them. If the word "and" is inserted in place of "of" in chapter 102, it would only be in case that the board was asked to certify the bonds, and the state engineer examined, supervised, and inspected the project from beginning to end of construction that a fee is required. In a case, therefore, involving the construction of a dam, where the district made no request for certification by the board, the state engineer would be required to

furnish services which were, perhaps, of the value of many thousands of dollars without any recompense to the state therefor. We cannot believe that the legislature meant to require the fee specified by section 4, *supra,* when both the board and the state engineer acted, and to donate the services of the state engineer when he alone performed the services. On the other hand, if we substitute the word "or," we have a fee provided, first, for cases when the board approved a project, in which case the services of the state engineer would be needed and used if the board did its full duty; and, second, for cases where the approval of a project by the board was not necessary, but where the state engineer was compelled by law to supervise it, as is the case with dams of the type covered by chapter 102, *supra.* The latter conclusion is much more reasonable than the former one, and we therefore hold that the legislature, by section 4, *supra,* intended and provided that the fees set forth in the section should be paid either when the board approved a project *or* when the state engineer was compelled to supervise it without such approval.

But had the legislature stopped at this point, no fee would be required in the present case, for the board, after chapter 102, *supra,* was adopted, had only the same jurisdiction to approve projects when the district passed a resolution requesting that its bonds be certified for savings bank investments and security for the public funds as it had under the act of 1921, and this resolution was not passed in the present case.

The District Enabling Act of 1934, as we have said, authorized irrigation districts to enter into contracts with the federal government for the purpose of borrowing money either to refund their previous existing indebtedness or to construct or repair their irrigation works. Paragraph 7 of that law reads as follows:

*"Approval by state certification board.* That not-withstanding the provisions of any general, special or local law, before any such contract or agreement shall become effective and binding upon the district the same shall be approved by resolution of the state certification board.''

By the precise terms of this section, the approval of the board was required for any contract for the borrowing of funds from the federal government, regardless of whether it had been required by any previous law. Nor was this approval conditioned upon the desire of the district to use its bonds for savings bank investments or security for public funds. Unlike the original statute, which was for the protection of the bondholder only, it was meant to protect the district, and its landowners as well, from improvident contracts. It was thus absolutely necessary for the district to have its contract for the borrowing of the $545,000 from the PWA, above referred to, approved by the board, regardless of the ultimate use of the bonds issued for the project. The request for approval was made and the board acted thereon.

It is contended by the plaintiff that the above provision brings the present case within the phrase, ''upon all projects for which approval is requested or to be requested of the state certification board,'' and that the fee set forth in section 4, chapter 102, *supra,* must be paid. It is the position of defendants that section 4, *supra,* limits the fee to cases where it is a *project* which requires approval, and does not include a mere contract or agreement to be approved by the board.

We think that the correct answer will depend upon whether the contract or agreement is of a class which involves a ''project.'' This word, as used in the statutes above referred to, undoubtedly means ''an undertaking devised to effect the reclamation or im-

provement of a particular area, . . . as by irrigation.'' Webster's New International Dictionary. If the contract or agreement to be approved involves a ''project,'' it is evident that, if the board does its duty, in all cases a careful investigation of the contract submitted, in all of its phases, is necessary. If the particular contract covers the construction or repair of irrigation works of a district, certainly before the board permits the property owners of the district to be burdened with the costs of such a project, it should investigate its feasibility from an economic and engineering standpoint, and then see that it is constructed in a manner approved by the board. The agreement with the PWA involved the construction of a project of the nature above referred to. On the other hand, the contract with the RFC for the refinancing of the bonds of the district already outstanding involved no new construction work. It was simply a question of the exchanging of one obligation of the district for another one. No ''project'' was involved in that contract.

A comparison and consideration of all of the statutes to which we have referred, and the reasons behind them, lead us to the conclusion that it was the intention of the legislature that whenever the approval of the board was required for any project for the construction or improvement of the works of an irrigation district, whether directly, or indirectly by the approval of a contract which involved the construction of a project, or when the law required the services of the state engineer in the investigation and supervision of any irrigation project, it was mandatory upon the district to pay the fee fixed by section 4, chapter 102, *supra*.

The judgment of the superior court of Maricopa county is reversed, and the case remanded, with in-

structions to issue a peremptory writ of *mandamus* as prayed for.

McALISTER, C. J., and ROSS, J., concur.