[No. 51945-5. En Banc. January 9, 1986.]

THE STATE FINANCE COMMITTEE, *Petitioner*, v. ROBERT
S. O'BRIEN, *as Treasurer, Respondent.*

*Kenneth O. Eikenberry, Attorney General,* and *Elvin J. Vandeberg* and *Clifford D. Foster, Jr.* (of *Kane, Vandeberg, Hartinger & Walker*), *Special Assistants,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *David E. Walsh, Deputy,* for respondent.

*Edward L. Fleisher* and *Martin H. Brown* on behalf of the Legislature, amici curiae for petitioner.

BRACHTENBACH, J.—This is an original action seeking a writ of mandamus ordering the state treasurer to sign resolutions authorizing the sale of state bonds.

The petitioner correctly and precisely states the issues:

Whether chapter 4, Laws of 1985, 1st ex. sess., which authorizes the state to issue bonds for a number of capital projects, violates Const. Art. 2, § 19 because it embraces more than one subject or is not properly titled?

The writ shall issue.

The issues arise from Const. art. 2, § 19: "No bill shall embrace more than one subject, and that shall be expressed in the title."

The title to the bill at issue provides that it is "an act relating to capital projects . . ." Lines 6 and 7 of the first

section of the bill authorize the State Finance Committee to issue general obligation bonds of the State in the amount of $285,851,000 to finance projects therein described.

 The two issues are title and subject matter. Our decision is made with two long–established premises in mind. First, the statute is presumed to be constitutional and the challenger bears a heavy burden to overcome that presumption. Second, article 2, section 19 is to be liberally construed in favor of the validity of the legislation. *State Higher Educ. Assistance Auth. v. Graham,* 84 Wn.2d 813, 529 P.2d 1051 (1974); *State v. Grisby,* 97 Wn.2d 493, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983).

 Examining the title it admittedly is broad in scope, but so be it. In a comprehensive opinion, 90 pages including the dissent, this court dealt with the title issue. *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 22, 211 P.2d 651 (1949), *overruled on other grounds in State ex rel. State Fin. Comm. v. Martin,* 62 Wn.2d 645, 384 P.2d 833 (1963). We there said, and it is still good law:

> Titles to statutes may be general or restrictive; or, in other words, broad or narrow, since the legislature in each case has the right to determine for itself how comprehensive shall be the object of the statute. And it also has a wide discretion in the particularity of the title selected to express it, provided that, by a fair construction, such title complies with the constitutional provision in question.

*Gruen,* at 22.

This title gave fair notice to legislators and the public that the Legislature was considering capital projects. That, in fact, is what it was considering. Turning to the subject matter issue, the Attorney General argues that the act authorizes a wide range of capital projects with separate and distinct purposes. It is correct that the authorized capital projects range from fisheries to educational facilities. However, it is equally true that the overall subject is singular—capital expenditures to carry out legitimate govern-

mental purposes.

In a landmark decision by Justice Hamilton, this court established the fundamental rules about subject matter. *Kueckelhan v. Federal Old Line Ins. Co. (Mut.),* 69 Wn.2d 392, 403, 418 P.2d 443 (1966). We said:

> The basic purposes of the constitutional mandate regarding the title to legislation is to enlighten the legislature and the general public as to what matters are being considered for legislation and to prevent logrolling in the legislative process. *Young Men's Christian Ass'n v. State,* 62 Wn.2d 504, 383 P.2d 497 (1963). However, this constitutional requirement is to be liberally construed so as not to impose awkward and hampering restrictions upon the legislature. *DeCano v. State,* 7 Wn.2d 613, 110 P.2d 627 (1941). Consequently, the legislature is deemed the judge of the scope which it will give to the word "subject." *Marston v. Humes,* 3 Wash. 267, 28 Pac. 520 (1891), *overruled on other grounds, In re Shilshole Ave.,* 101 Wash. 136, 172 Pac. 338 (1918). So long as the title embraces a general subject, it is not violative of the constitution even though the general subject contains several incidental subjects or subdivisions. *Robison v. Dwyer,* 58 Wn.2d 576, 364 P.2d 521 (1961); *Washington Toll Bridge Authority v. State,* 49 Wn.2d 520, 304 P.2d 676 (1956). All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. If this nexus can be found, the act will survive the light of constitutional inspection. *State ex rel. Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 377 P.2d 466 (1962).

A branch of government which is independent and coequal, which the judiciary is, must respect the decisions of an also independent and coequal branch, which the Legislature is. Absent a clear violation of the constitution, which we do not perceive here, the Legislature is entitled to determine what is within the "subject" of a bill. It did so and we should not inquire further.

The writ shall issue.

UTTER, DORE, PEARSON, and ANDERSEN, JJ., and HAMILTON, J. Pro Tem., concur.

CALLOW, J. (dissenting)—Article 2, section 19 of the Washington State Constitution reads:

Bill to contain one subject. No bill shall embrace more than one subject, and that shall be expressed in the title.

The title of House Bill 1328 reads as follows:

AN ACT Relating to capital projects authorized in the state capital budget acts; amending RCW 75.48.020, 28A-.47.792, 28A.47B.010, 28B.10.850, 28B.14C.010, and 43.83.150; adding a new chapter to title 43 RCW; and declaring an emergency.

There is no reference in the title to the incurrence of debt by the issuance and sale of $285,851,000 of general obligation bonds.

## A BILL'S ONE SUBJECT MUST BE EXPRESSED IN THE TITLE

The test of the sufficiency of the expression of the subject of a bill is that it must give notice of its object so as to reasonably lead to an inquiry into its contents. In other words, the title of the bill should reasonably inform a reader about the subject matter of the bill. *Flanders v. Morris,* 88 Wn.2d 183, 558 P.2d 769 (1977); *Brewster Pub. Schs. v. PUD 1,* 82 Wn.2d 839, 514 P.2d 913 (1973); *State Sch. Directors Ass'n v. Department of Labor & Indus.,* 82 Wn.2d 367, 510 P.2d 818 (1973); *American Fed'n of Teachers, Yakima Local 1485 v. Yakima Sch. Dist. 7,* 74 Wn.2d 865, 447 P.2d 593 (1968); *State v. Lounsbery,* 74 Wn.2d 659, 445 P.2d 1017 (1968); *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965), *appeal dismissed,* 385 U.S. 10, 17 L. Ed. 2d 10, 87 S. Ct. 70 (1966). *State v. Winters,* 67 Wn.2d 465, 466–67, 407 P.2d 988 (1965), *appeal dismissed,* 384 U.S. 208, 16 L. Ed. 2d 481, 86 S. Ct. 1461 (1966), stated:

[T]he purposes of [article 2, section 19] are to:
1. Protect members of the legislature against provisions in bills of which the title gives no intimation.
2. Apprise the public concerning subjects of legislation being considered.
3. Prevent hodgepodge or logrolling legislation.

With equal frequency it has been said that a title com-

plies with the constitution if it gives notice that would lead to an inquiry into the body of the act, or indicates to an inquiring mind its scope and purpose.

(Footnote omitted.)

House Bill 1328 deals with the issuance of general obligation bonds and the funding for a myriad of capital projects. The title of the bill gives no notice of the authorization of general obligation bonds to provide for funding those projects which would impose a $285 million debt upon the State. While it is proper for the Legislature to refer to sections of the revised code in the title of an act, this cannot take the place of the constitutional requirement that the title must contain some statement indicating the actual content of the bill. *State ex rel. Seattle Elec. Co. v. Superior Court,* 28 Wash. 317, 68 P. 957 (1902).

If notice were to be given to the members of the Legislature and to the general public of the subject of the bill, there should have been added to its title the phrase, "and providing for the funding thereof by the issuance and sale of general obligation bonds." When the Code Reviser published the contents of the bill as chapter 4 of Laws of 1985, 1st Ex. Sess., the insufficiency of the title apparently was recognized and the words "bonds for capital projects" were added as a heading at the beginning of the chapter long after the passage of the bill by the Legislature. The session laws reflect this at page 2289, in the following form.

CHAPTER 4
[House Bill No. 1328]
BONDS FOR CAPITAL PROJECTS
AN ACT Relating to capital projects authorized in the state capital budget acts; amending RCW . . .

HB 1328 concerns the issuance of bonds to fund innumerable capital improvements for the executive and administrative departments of state government. The term "Capital Budget" in the title provides no notice that the capital projects will be paid for by the sale of bonds, yet every act that the bill amends (now amending sections of the Revised Code of Washington) contained the word

"bond" in its title. *See* Laws of 1969, ch. 13; Laws of 1973, 1st Ex. Sess., ch. 135; Laws of 1977, 1st Ex. Sess., ch. 308; Laws of 1979, 1st Ex. Sess., ch. 230; Laws of 1980, ch. 141.

The contents of the bill were in the following format:

Sec. 1. The state finance committee is authorized to issue general obligation bonds of the state of Washington in the sum of two hundred eighty–five million eight hundred fifty–one thousand dollars, or so much thereof as may be required, to finance the projects authorized in section 2 of this act and all costs incidental thereto.

. . .

Sec. 2. Bonds issued under section 1 . . . are subject to the following conditions and limitations:

(1) General obligation bonds . . . in the sum of thirty–eight million fifty–four thousand dollars . . . for the purpose of providing funds for the department of general administration . . .

(2) General obligation bonds . . . in the sum of four million six hundred thirty–five thousand dollars, . . . for . . . a Washington state agricultural trade center . . .

(3) General obligation bonds . . . in the sum of thirty–eight million seven hundred sixty–two thousand dollars . . . for the purpose of providing funds for the department of social and health services and the department of corrections to perform capital projects . . .

(4) General obligation bonds . . . in the sum of three million two hundred thirty thousand dollars . . . for the purpose of providing funds for the department of ecology, parks and recreation commission, department of fisheries, department of game, and the department of natural resources to acquire real property and perform capital projects . . .

The bill continues for section after section in the same recitations regarding the authorization of the issuance of general obligation bonds. The bill dealt with the issuance of general obligation bonds and the title should have said so.

It is a commonsense requirement that the title of a bill expressly indicate its content without the need to search further, or to imagine all of the possible subjects which might be encompassed under a particular title. The news media reports the titles of bills, and the titles only, from

time to time for the information and edification of the general public. The titles of the bills alone are printed as an index for those interested in legislation. The passage of bills is often upon a reading of the bill by title only. When that title does not indicate that the bill is an indebtedness authorization or a spending bill, it may well escape the notice of those that the framers of the constitution meant to inform.

The majority relies upon *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 9–10, 211 P.2d 651 (1949) which quotes from *State ex rel. State Toll Bridge Auth. v. Yelle,* 32 Wn.2d 13, 24–26, 200 P.2d 467 (1948), as follows:

> "The purposes of this constitutional mandate are threefold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) to prevent hodge–podge or log–rolling legislation. We have declared that when laws are enacted in violation of this constitutional mandate, the courts will not hesitate to declare them void.
>
> "Another rule which has been frequently stated by this court is that the title of an act need not be an index to the contents of the legislation that follows, nor need it express in detail every phase of the subject which is dealt with by the enactment, but that it is sufficient if the title gives such notice as should reasonably lead to an inquiry into the body of the act itself, or indicates, to an inquiring mind, the scope and purpose of the law. [Citing cases.]
>
> "In applying this latter rule, however, there is a distinction between the effect of a broad, general title and that of a narrow, restricted one. If the title is general and comprehensive, it will be given a liberal construction; in such case, no elaborate statement of the subject of the act is necessary, and a few well–chosen words suggestive of the general subject treated is all that is required. If, however, the title is a restricted one, it will not be regarded so liberally, and provisions which are not fairly within such restricted title will not be given force."

It is recognized that the application of these rules can be

restrictive or flexible, but it is submitted that they should not be so interpreted as to weaken Const. art. 2, § 19 to the extent that its "threefold" purposes will not be accomplished. *See Kueckelhan v. Federal Old Line Ins. Co. (Mut.),* 69 Wn.2d 392, 418 P.2d 443 (1966).

A "capital project" is any physical public betterment or improvement. *Gerges v. Koch,* 62 N.Y.2d 84, 464 N.E.2d 441, 476 N.Y.S.2d 73 (1984); *State ex rel. Sullivan v. Burns,* 51 Ariz. 384, 77 P.2d 215 (1938). The word "capital" may have different meanings when used in different connections. *Commissioner of Corps. & Taxation v. Filoon,* 310 Mass. 374, 38 N.E.2d 693 (1941). The term can refer to property, money, wealth, the place where legislative and executive offices are located, the sum total of corporate stock, or that portion of the produce of the industry of a country that may be made directly available to finance production. Black's Law Dictionary (5th rev. ed. 1979); *Webster's Third New International Dictionary.* It usually refers to many things other than the funding of projects by the issuance of bonds. It is argued that the subject matter of the bill is included in the words "Capital Projects". If that construction is to be the future guide to the interpretation of Const. art. 2, § 19, then such general undescriptive topics as "state business" and "legislative concerns" may well be approved bill titles in the years to come.

When the State Constitution was formulated it borrowed heavily from the Organic Act which established the territorial government of Washington. In the act we find in section 6

> To avoid improper influences, which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title.

I submit that to embrace in one bill the issuance of bonds for the funding of projects for the Department of Social and Health Services, for Fisheries, for Higher Education, and for an agricultural trade center, among others, covers more than one subject. *Harland v. Territory,* 3 Wash. Terr.

131, 144, 13 P. 453 (1887), though handed down nearly 100 years ago, is applicable today. It finds no difference in the terms "object" and "subject" and states in part, quoting from decisions of other states:

"The purpose to be effected by this section was to prevent the incorporation in one bill of provisions of a nature totally diverse and without necessary connection, with a view to effect a general combination of the particular friends of each measure, and thereby secure their enactment, when some or all of them would likely fail if left to stand on their own merits; and also the entrapping of legislators into the support of a bill into which by dexterous management some insidious provision had been inserted of which the title gave no intimation." [Texas.]

"These provisions were adopted to prevent the legislature from passing what are commonly known as 'omnibus bills.'" [Arkansas.]

"The object of this provision was, that neither the members of the legislature nor the people should be misled by the title." [New York.]

"The intent of this provision of the constitution was to prevent the union in the same act of incongruous matters, and of objects having no connection or relation. And with this it was designed to prevent surprise in legislation, by having matters of one nature embraced in a bill whose title expressed another." [Iowa.]

"The object of this constitutional provision was to require so clear an expression of the subject of the bill in the title, that it would at once apprise legislators and others interested of the precise subject of the proposed legislation." [Missouri.]

*Harland v. Territory, supra,* was overruled by *Marston v. Humes,* 3 Wash. 267, 28 P. 520 (1891), which held that so long as the title embraces but one subject it is acceptable even though the bill contains any number of sub–subjects. With this I cannot quarrel. However, neither *Marston* nor later cases permit the true content of a bill to be unexpressed in its title, nor do *Marston* and the following cases grant approval to omnibus–catchall bills.

LOGROLLING

HB 1328 is a bill abounding in the possibilities for logrolling which Const. art. 2, § 19 was designed to avoid. Logrolling has been defined as the exchange of political favors, especially the trading of votes among legislators to achieve the passage of projects of interest to one another. It is the combining together of two or more legislators for the assistance of one another when their votes should be cast independently. The purpose of Const. art. 2, § 19 was to require that any subject of legislation pass or fail on its own merits. It was the purpose of article 2, section 19 to discourage legislators from voting for the unwise or improvident projects of others in order to secure votes for their own particular projects. *State v. Winters,* 67 Wn.2d 465, 407 P.2d 988 (1965), *appeal dismissed,* 384 U.S. 208, 16 L. Ed. 2d 481, 86 S. Ct. 1461 (1966); *Robison v. Dwyer,* 58 Wn.2d 576, 364 P.2d 521 (1961).

There is no showing that that was done here, and, indeed, it would not be the function of this court to inquire into the inner workings of the Legislature in any case. It is, however, the function of the court to look to the compliance by the Legislature with Const. art. 2, § 19. That the bill was in the form in which logrolling was a possibility is underscored by the comment of a legislator made during floor discussion (as reflected by the record submitted to us), when it was said:

. . . HB 1328 is the capital budget. This is where we got lots of fun with the capital budget out here, we found a few things in it for everybody, . . .

*Kueckelhan v. Federal Old Line Ins. Co. (Mut.), supra* at 403, was relied upon by the majority. That decision as quoted held that the purpose of Const. art. 2, § 19:

is to enlighten the legislature and the general public as to what matters are being considered for legislation and to prevent logrolling in the legislative process.

ARTICLE 2, SECTION 19, AND AMENDMENT 60

The majority pays no heed to the argument of the Attor-

ney General that when article 8, section 1 (as changed by amendment 60) and article 2, section 19 of the Washington State Constitution are read and applied together to HB 1328, the specter is raised that the debt limitations of amendment 60 could be threatened by the consolidation of the authorization of numerous bond issues into one bill. It is argued that especially when legislative bills create long–term debt, each subject must be covered in a separate bill.

In 1972 amendment 60 was added to the Washington State Constitution by a vote of the people of the state. The purpose of the amendment was stated to be the reduction of the interest costs of future bonding and the restriction of the Legislature's ability to incur state debt without the approval of the voters. It was stated in the Official Voters Pamphlet, at 51, that the then existing limitation on the incurrence of debt had been ineffective. The explanation of HJR 52, which became amendment 60, was stated in part as follows:

> This new provision would allow the legislature to author-ize such indebtedness as would be governed by the amendment only by a three–fifths majority vote in both houses. In addition, such indebtedness could only be authorized by the legislature to the extent that the aggregate of all such debts . . . would not require annual debt service payment (i.e., principal and interest) to exceed nine percent of the average amount of general state revenues for the period of three fiscal years imme-diately preceding the contracting of the particular debt.

The passage of HB 1328 may ultimately menace the con-stitutional debt ceiling of amendment 60. It is because of that risk that it is proper when bills include debt authoriza-tion through the issuance of bonds that Const. art. 2, § 19 be strictly construed and each bill contain a bond authoriza-tion relating to only one subject. As stated in the discus-sion in the House on June 10, 1985:

> We are doing something very significant here this morn-ing. We're passing bonds to fund the capital budget but without any recognition of what this is doing to us in the next biennium, but more importantly, the following

biennium. And if we look at this, the action today of the previous bill, and this bill will, if we do our traditional funding mechanism, put us in jeopardy of having no funds available for water cleanup or for other water projects in this state, but more importantly, in the next biennium, the following biennium, 1987–89, our Centennial, will drive us right up to the debt ceiling. We have already authorized this legislature body more bonds than we can issue by our statutory or Constitutional debt ceiling. And while this may be good practice, to authorize things our Finance Committee cannot spend because we're up against the bond ceiling, I don't think it's the wisest choice to do. I am voting no on this, because I believe that we, the legislature, should set some priorities. We the legislature should have public hearing and look at the bonds that have been authorized, and we determine what priorities should be issued for those bonds and not let [sic] it up to the Finance Committee.

Transcript of House Floor Debate at 3–4 (June 10, 1985).

The authorization and control of indebtedness is the responsibility of the Legislature. This responsibility cannot be passed on to the State Finance Committee. It is conceded by the requirement of a 60 percent vote of both House and Senate that the indebtedness incurred by HB 1328 is limited by the prohibition against the incurrence of debt which will cause the maximum annual debt service on all outstanding general obligation debt to exceed 9 percent of the arithmetic mean of general state revenues for the preceding 3 fiscal years.

HB 1328 was an omnibus bill "with a little something for everyone." As such it violated the one subject rule by consolidating multiple projects into one all inclusive bill. As stated in *Blaine v. Seattle,* 62 Wash. 445, 447–49, 114 P. 164 (1911):

If, then, the method adopted in this instance of submitting these eight propositions to the voter and compelling him to assent to or dissent from each and all of them or lose his vote is inconsistent with the constitution and

laws of the state, it must fail. The constitutional inhibition as to such indebtedness as is here sought to be created is that no city shall for any purpose become so indebted in any manner, without the assent of three–fifths of the voters, voting at an election held for that purpose. What is the meaning of this provision, if not that no city, whatever its purpose may be, however needful or meritorious may be the object, however necessary to the safety, good health, or general welfare of its citizens, may not incur an indebtedness beyond the one and one–half per cent of its taxable property, unless three–fifths of the voters shall assent? What is the public policy created by such a provision, if not that the voter shall freely, voluntarily, and with a full knowledge of the purpose of the election and the object to be attained thereby, consent to the laying of this additional burden of taxation upon his property? . . .

How can a voter express his free and intelligent assent to such an additional burden of taxation when, in order to so express it, he is compelled to express a like assent to other measures, with which he is not in sympathy nor accord, and against which, if given the opportunity, he would cast his vote. Here we have eight separate and distinct propositions upon which as a whole the voter must assent or dissent. Some he favors, others he is opposed to; and yet, in order to express his assent upon those he favors, and which in his judgment are needful for the city's growth and prosperity, he must likewise express, not an intelligent nor free, but a controlled and compelled assent to measures he deems harmful. . . .

The vice of this method adopted by the city to compel an affirmative vote on all eight measures is readily apparent upon an examination of the propositions submitted, propositions in which there is nothing in common, nor any such unity of interest as would lead any one to either favor or disfavor all eight measures.

The legislative action proposed in *Blaine* contained the same flaws and fatal contamination as that before us. The same precepts and mandates should apply to the issue here.

I would hold that HB 1328 contained more than one subject and that its subject was not expressed in its title.

I would dismiss the action and would not require the State Treasurer to sign the State Finance Committee resolutions.

GOODLOE, J., and SCHUMACHER, J. Pro Tem., concur with CALLOW, J.