385 F.2d 512
 Enrique NAVARRO, Individually and as President of Local 2 of International Union of Police and Protection Employees — Independent Watchmen's Association, and on Behalf of All Members Similarly Situated, Plaintiffs-Appellees,
v.
John J. GANNON, Individually and as President of Independent Watchmen's Association, Defendants-Appellants.
 No. 79.
 Docket 31444.
 United States Court of Appeals Second Circuit.
 Argued October 9, 1967.
 Decided November 20, 1967.
 
 COPYRIGHT MATERIAL OMITTED Charles P. Axelrod, New York City (Robert M. Heller and Philip Pierce, Heller & Pierce, New York City, on the brief), for plaintiffs-appellees.
 Jerome H. Shapiro, New York City (Wilfred L. Davis and Joy M. Holz, New York City, on the brief), for defendants-appellants.
 Before LUMBARD, Chief Judge, and SMITH and FEINBERG, Circuit Judges.
 LUMBARD, Chief Judge:
 
 
 1
 This appeal raises an important question under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq.: whether the guaranty of the right in Section 101(a) (1) and (2)[1] of the Act to meet, assemble and discuss matters properly before a union meeting justifies injunctive relief against threatened supervision of a local union's meeting by representatives of a parent labor organization. We hold that the LMRDA secures the right of union members to meet without interference from the international union except where the parent organization acts in accordance with lawfully established procedures to institute a trusteeship over the local union. We therefore affirm the order of the Southern District which granted the motion of appellees for a preliminary injunction.
 
 
 2
 The plaintiff, Enrique Navarro, as an individual member and as President of Local 2 of the International Union of Police and Protection Employees — Independent Watchmen's Association, brought this action under Section 102 of the LMRDA, 29 U.S.C. § 412[2] against the defendants, John J. Gannon, individually and as President of the Independent Watchmen's Association, an international union of which Local 2 is an affiliated local.
 
 
 3
 The plaintiff sought an injunction restraining the defendants from interfering with the meeting of Local 2 scheduled for February 19, 1967 on the ground that such interference would be in violation of the LMRDA, the constitution of the I. W. A. and the bylaws of Local 2;[3] in particular, plaintiffs sought to restrain defendants from assuming control of the Local meeting, from barring Local counsel from the meeting, from interfering with the right of members to express views on matters properly before the meeting, and from interfering with the right to have Local officers preside over the meeting. Plaintiffs also sought a declaratory judgment that the threatened acts described in a letter of February 9, 1967 to the members of Local 2 violated the I. W. A. constitution, the bylaws of Local 2, the provisions of 29 U.S.C. § 411, and the Constitution of the United States.
 
 
 4
 The letter of February 9, 1967 was signed by James J. McFaun, Secretary-Treasurer of the I. W. A. and was written at the direction of the defendant. In the letter to members of Local 2, defendant indicated an awareness of "problems which have existed in your Local," in particular the desire of some members to disaffiliate from the I. W. A., the action of the Local in replacing its counsel, the attempt made within the Local to change the insurance company responsible for administering the welfare program. The letter then announced that Gannon, the International president, had directed that the International vice-president attend and preside over the Local meeting, that the International secretary-treasurer and Sergeant-at-Arms assist him, and that no counsel be permitted to attend.[4] On February 17, 1967 Judge Motley issued an order temporarily restraining the I. W. A. from such interference. The next day, February 18, 1967, Judge Anderson denied the defendant's application to stay the order. After a hearing on March 14, Judge Metzner, in an order entered on May 3, 1967, granted the plaintiff's motion for a preliminary injunction and denied defendant's cross-motion to dismiss the action.
 
 
 5
 The order issued by Judge Metzner[5] enjoined the defendants from assuming control of any meetings of Local 2; from attending any meetings, or participating in them except as provided in the constitution of I. W. A. and the bylaws of Local 2; from interfering with the attendance of counsel at meetings of Local 2; from interfering with the right of Local 2 members to meet and assemble freely; from preventing the expression of views upon business properly before the meeting; from interfering with the right of officers of Local 2 to preside at meetings of their local union. We agree with Judge Metzner that the rights of the plaintiff, protected by federal law, were threatened by the defendants and we find that the injunction was a proper exercise of his discretion.
 
 
 6
 Defendants appeal from the preliminary injunction, contending first that no violation of any right secured by Section 101(a) (1) and (2) was shown to justify the order; and second, that the issue was mooted by the holding of the meeting on February 19 without interference, and that there was no showing of the likelihood of future interference.
 
 
 7
 Section 101(a) (1) guarantees in pertinent part the right of every member of a labor union "to attend membership meetings and to participate in the deliberations * * * of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws." And Section 101(a) (2) secures the "right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, * * * upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings." To protect these rights, Section 102, 29 U.S.C. § 412, provides that suit may be brought in the federal courts for appropriate relief.
 
 
 8
 As Local 2 is an affiliate of the I. W. A., its members are bound by the terms of the I. W. A. constitution.[6] Under Article XV, the International Executive Board is given power to discipline any local union or member who, after notice and hearing upon charges, is found guilty of "dishonesty, misconduct, or conduct detrimental to the welfare of the I. W. A., or of violating any provision of this Constitution." Under Article XVII, the International is given authority to establish a trusteeship over any local for the purpose of correcting corruption or malpractice, to assure that the local will carry out responsibilities as a bargaining representative, or under a bargaining agreement, to restore democratic procedures, or to otherwise carry out the purposes of the I. W. A. These specified purposes follow exactly the requirements for establishing trusteeships imposed by Title III of the LMRDA, 29 U.S.C. § 461 et seq. Article IX of the I. W. A. constitution gives the International President "other and further powers in addition to those herein enumerated and [he] shall perform such other and further duties as are usual to his office and as are performed by the president in accordance with the practices of the I. W. A." The defendant seeks to justify the supervision outlined in the letter of February 9, 1967 to plaintiffs, not on Article XVII governing trusteeships, nor on Article XV dealing with discipline of local unions and local members, but on the additional and unspecified powers granted to the International President by Article IX of the constitution.[7]
 
 
 9
 The question before us is whether the rights guaranteed by Section 101 of the LMRDA include the right of local members to run the affairs of their union without interference from the international union with which they are affiliated. This question was apparently not considered in the congressional debates leading to passage of the Bill of Rights in the LMRDA.[8] That the legislative history of these provisions of the Act includes no mention of circumstances such as those which give rise to this case does not compel the conclusion that no protection was intended by the Congress. The Bill of Rights that appears as Title I of the Act was hastily drafted and included without much debate. The debate on the guaranty of a right of assembly in Section 101(a) (2) was chiefly concerned with enabling members to confer outside regular meetings for the purpose of discussing union affairs without fear of reprisal by union officials. 105 Cong. Rec. 5812 (daily ed. April 22, 1959) (remarks of Sen. McClellan); see 105 Cong. Rec. 14,336 (daily ed. August 12, 1959) (remarks of Rep. Derwinski). To make this clear, a semi-colon was inserted separating the clause dealing with rights of speech and assembly at such rump sessions from the provisions for freedom of speech at regular meetings, on which we rely here, see 105 Cong.Rec. 6021 (daily ed. April 25, 1959).
 
 
 10
 Without any express indication of congressional intent, we must determine whether Section 101(a) (2) guarantees a right to meet without interference from the international union by considering the broad purposes of the Bill of Rights. This we have done, and the conclusion that such a right is comprehended by the law seems inescapable. We hold that the guaranty in Section 101(a) (1) of the equal right to participate in the deliberations and voting at union meetings, and the guaranty in Section 101(a) (2) of the right to express views upon business before the meeting necessarily encompass the right to assemble, consult and decide matters of concern to the local union without the inhibiting presence and control by international officials.
 
 
 11
 The LMRDA was enacted with the clear purpose of assuring "the full and active participation by the rank and file in the affairs of the union." American Federation of Musicians v. Wittstein, 379 U.S. 171, 182-183, 85 S.Ct. 300, 307, 13 L.Ed.2d 214 (1964). The Congress by passing a "Bill of Rights" for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values in the labor movement.
 
 
 12
 To effectuate that determination, the Bill of Rights was incorporated into the Act, guaranteeing each union member protection against infringement of his rights to vote, to meet, and to participate in discussions on matters of concern to him and his union. These rights are protected against incursion or subversion by the individual's own representatives, the officers of his union. Thus, the individual member cannot be disciplined for criticizing or even defaming those officers, Salzhandler v. Caputo, 316 F.2d 445 (2 Cir. 1963), and the official of a local union will not be permitted to retaliate against members who attend meetings to consider affiliation with an international union. Johnson v. Local Union No. 58, International Brotherhood of Electrical Workers, 181 F. Supp. 734 (D.C.Mich.1960). These rights should be similarly protected against invasion from without the local, for the guarantees carefully enforced against officers of the local would amount to nothing if they could be enjoyed only by the grace of the International.
 
 
 13
 There can be little doubt that these secured rights of speech and assembly would be compromised if the Local meeting is taken over by the International. The right of assembly must include the right to meet under the supervision of the representatives chosen for that purpose. That is the cornerstone of democratic rule — that the government is freely chosen by the governed. And the representatives, the officers of Local 2, may not be shunted aside without gravely endangering the individual rights of the members.
 
 
 14
 In attempting to assume control of the meeting of Local 2, the International Union purported to act in order to ensure the rights of local members — but we see in the record before us no indication that any interest of the Local membership was being abused by their chosen representatives. And if the Local officers show insufficient respect to the views of the rank and file, there exist remedies for such infringement within the union organization and by access to the courts. But the defendants have pointedly chosen not to establish a trusteeship according to the procedures set out in Article XVII of the Constitution and Title III of the LMRDA, and in the absence of such recourse, the autonomy of the local union should be our primary concern.
 
 
 15
 The international union concededly acted to restrain a recalcitrant local from leaving the fold — but the guaranty of self-determination contained in Title I of the Act protects the Local members against such unwanted beneficence. The fundamental requirement of union democracy is that decisions are made according to the expressed desires of those affected; and this requirement is met only where there is full freedom to criticize, to dissent, and to oppose. The best guaranty of this freedom is that the Local meeting be run by the elected officers of the Local; to have hostile outsiders attempt to manage the meeting, determine who may attend, and who is to be recognized is the surest way to stifle and destroy the very rights which the Act seeks to protect.
 
 
 16
 The principle of union democracy encompasses, as Clyde Summers has said, "the right to choose, even unwisely, [for] self-government is self-fulfillment."[9] We need not dispute the contention of defendant Gannon that "it is greatly to the advantage of each and every guard to belong to a Union, which is as large as possible so that we will have greater bargaining power and greater financial stability." Union autocracy may indeed be more effective in mobilizing the collective power of workers to gain greater material benefits. But Congress determined that the aims of labor organizations were broader, that the ideals of responsibility and self-determination must be weighed with the goal of economic security, and that union democracy was so important to those ideals that it should be protected as a matter of national policy. Professor Cox has said:
 
 
 17
 "The law cannot create the spirit of self-government. It cannot compel union members to attend meetings or hold their officers to strict accounting. It cannot compel members to see in labor unions something more than service organizations hired to obtain benefits in return for dues. The most the law can do is to secure the opportunity for workers who wish to take an active part in democratic unions without undue loss of personal freedom."[10]
 
 
 18
 In electing a new slate of officers in 1965, in asking whether the present insurance company was administering the welfare program successfully, and even in asking whether their particular interests were best served by affiliation with I. W. A., the members of Local 2 were exercising their rights of self-government. Their activity and spirit might be an embarrassment to the I. W. A.; a uniform stance rather than the independence and controversy guiding Local 2 might be preferable to the International. But in Title I, the legislature indicated its preference in union government no less than in political government for the tumult of democracy rather than the order of imposed authority. In particular, Section 101(a) (2) ensured the right of every member to "express at meetings of the labor organization his views, upon * * * any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings". We think it essential to the effectiveness of this guaranty, and implicit therein, that the members be free from inhibiting controls imposed on their meetings from without. The Local has the authority to impose reasonable rules to maintain the order and decorum needed to dispose of the business of the meeting, but that proviso gives no authority for a take-over by the parent organization.
 
 
 19
 Nor is our conclusion in conflict with other decisions of this court and of the Supreme Court denying relief under Section 102 of the Act. It should be noted that the bounds of guarantees of the Bill of Rights in Title I as determined by the courts are still, some eight years after its enactment, in the early stages of development. In Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the Supreme Court held that the specific requirements in Title IV, Section 401(e) governing eligibility for office precluded an inference of similar rights in Section 101(a) (1), and that therefore a bylaw requiring that members nominate only themselves for office could not be attacked as a violation of the guarantees of equal voting rights in Section 101 (a) (1). Justice Black clearly implied that the voting rights protected by Section 101(a) (1) must be directly attacked to warrant suit under Section 102. This court was guided by that implication in finding that the right to equality in voting was not violated by the action of the executive board of the union arbitrarily voiding the result of a vote after it is taken. Gurton v. Arons, 2 Cir., 339 F.2d 371 (1964). But here we rely not on the threat from the International to the voting rights of Local 2 although it would seem that there exists justification for finding that these rights would be attacked, whether directly or indirectly, if the International were permitted to take over the meeting. Here we deal instead with a threatened invasion of the members' right of free discussion, and we find that guaranty encompasses the right to meet under the direction of their own officers untrammelled by outsiders who by their own admission are dissatisfied with the course of action freely taken by the local.
 
 
 20
 That position is not at odds with the opinion of this court in Yanity v. Benware, 2 Cir., 376 F.2d 197 (1967). In that case, this court held that the right to meet and assemble freely in Section 101(a) (2) of the Act does not create a right to call meetings of the membership, but rather insures the right to assemble outside regular meetings without fear of reprisal from the union. Thus, it was found that the failure of the union officers to convene a special meeting as they were required to do by their bylaws was not a violation of Section 101(a) (2) and did not justify an action under Section 102. But here we rely not on the meet and assemble clause of the Act, but on the right of discussion at regular meetings which have been called. The majority in Yanity explicitly avoided any examination of the scope of this right because the connection between the alleged violation and the injury suffered was too speculative and remote: "We need not decide the extent to which this provision creates a federal right to bring any appropriate business before a union meeting and have a vote upon it." 376 F.2d at 200. In this case we decide only that Section 101(a) (2) does create a federal right to discuss matters before a union meeting without the inhibiting presence and supervision of International officers. We need not resolve whether that includes the right to discuss any particular matter, since it seems clear to us that free discussion is impossible if the forum is under the control of superior force, with foreigners patrolling the meeting chamber and exercising the prerogatives of the chair.
 
 
 21
 The appellant contends that no injunction should issue because there has been no actual interference with the rights of free discussion or assembly. But surely we need not wait until the meeting is held and the members have been suppressed in the exercise of their statutory rights. The potential for suppression of views, indeed the purpose to interfere in the affairs of the local is clear from the defendants' letter, and we know from political experience that once suppressed, the democratic spirit may not soon be revived in Local 2.
 
 
 22
 Appellant argues, too, that the issue is moot since the letter referred only to the meeting scheduled for February 19, 1967, and that meeting has passed without incident. But the likelihood of interference remains; we have no assurance that the same instinct for control over the activities of Local 2 will not govern the I. W. A. in the immediate future. Injunctive relief is proper when "cessation of illegal conduct did not diminish the risk of future similar conduct". Lanigan v. Local 9, International Brotherhood of Electrical Workers, 327 F.2d 627 (7 Cir.), cert. denied 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). See Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29 (1944); Local 74, United Brotherhood of Carpenters and Joiners v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 652 (1951). The district judge acted well within his discretion in granting the injunction.
 
 
 23
 The order of the district court is, accordingly, affirmed.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C. § 411 (a) (1):
 "Equal rights. — Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."
 29 U.S.C. § 411(a) (2):
 "Freedom of speech and assembly. — Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."
 
 
 [2]
 29 U.S.C. § 412:
 "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."
 
 
 [3]
 Although an officer of the union, plaintiff may bring this action to protect his secured rights as an individual member. Salzhandler v. Caputo, 316 F.2d 445 (2 Cir. 1963); Grand Lodge of Intern. Ass'n of Machinists v. King, 335 F.2d 340 (9 Cir. 1964), cert. denied 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334
 
 
 [4]
 In the letter to the members of Local 2, defendants directed that:
 "1. First Vice-President Kirby attend your next stated meeting called for February 19, 1967 and act as chairman of such meeting.
 
 
 [2]
 Secretary-Treasurer McFaun and Sergeant-at-Arms Mancina attend such meeting and assist Vice-President Kirby in conducting same
 
 
 [3]
 Secretary-Treasurer McFaun be appointed to take true and exact minutes of such meeting
 
 
 [4]
 No counsel be permitted to attend this meeting
 
 
 [5]
 Only members of the Local in good standing on proper showing of dues books be permitted to participate in the meeting and that all other persons other than those members of Local 2 in good standing and the International Officers specified herein be excluded from participation in the conduct of such meeting
 
 
 [5]
 Defendants were enjoined from:
 "1. Assuming control of any membership or Executive Board meetings of Local 2, International Union of Police and Protection Employees — Independent Watchmen's Association;
 
 
 [2]
 Attending any membership meetings of Local 2, or participating in the deliberation and voting upon the business of such meetings except as provided in the Constitution of the Independent Watchmen's Association and the ByLaws of Local 2, International Union of Police and Protection Employees — Independent Watchmen's Association;
 
 
 [3]
 From interfering with the attendance of counsel for Plaintiffs at meetings at Local 2;
 
 
 [4]
 From directly or indirectly in violation of the Constitution of the Independent Watchmen's Association, By-Laws and Charter of Local 2 hindering or interfering with the right of plaintiff and all other members of Local 2 to meet and assemble freely with other members;
 
 
 [5]
 From preventing the expression at meetings of Local 2 views upon any business properly before the meeting;
 
 
 [6]
 From denying or interfering with the right of duly elected officers and officials of Local 2 to preside over the meetings of the aforesaid Local, all on the ground that such action by the defendants is and will be in violation of 29 U.S.C. 411-413 and 29 U.S.C. 529."
 
 
 [6]
 An action may not be brought under Section 102 of the LMRDA to enforce provisions of the union constitution, Yanity v. Benware, 376 F.2d 197 (2 Cir. 1967), and no provision of the International constitution can define or limit the rights conferred by Title II of the Act. Johnson v. Nelson, 325 F.2d 646 (8 Cir. 1963). It is only when, as here, a claim is made that the constitution is being applied in such a way as to deprive the local members of their secured rights that the documents may be considered. Gurton v. Arons, 339 F.2d 371, 374 (2 Cir. 1964). We refer to the constitution only to show that it provides procedures by which abuses in local unions may be controlled by the International, and to indicate that the defendants here chose not to follow those procedures, or even to allege such abuses, but instead sought to assume control of the local under their general supervisory authority. This they cannot do if assumption of control involves a deprivation of a right protected by the Act
 
 
 [7]
 The asserted control in this case would seem to come within the definition of trusteeship in the Act. Section 3(h) defines trusteeship to mean any "method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws." 29 U. S.C. § 402(h). In Title III of the Act, imposition of trusteeship is subjected to regulations specifying the purposes for which it may be imposed and providing a civil action for enforcement of the requirements. See Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 635-44 (1959) outlining the case for federal legislation regulating trusteeships. Professor Cox played a critical role in the process of drafting legislation, and his suggestions were followed closely in the statute as enacted. See Anderson, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L.J. 1460, 1498-1500 (1962); Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 851, 898-902 (1960). We need not decide whether the defendants' action was a lawful trusteeship under its constitution and the Act; nor should we speculate on the reasons behind the plaintiff's decision to bring the suit under Section 102 rather than Section 304. In Schonfeld v. Raftery, 2 Cir., 381 F.2d 446 (Aug. 10, 1967), this court upheld an injunction granted under Section 304 to terminate an unlawful trusteeship. In Flaherty v. McDonald, 183 F.Supp. 300 (S.D.Calif. 1960), it was held that Section 101(a) (1) did not create a right to challenge removal of local officers by an international union acting under the authority of an allegedly improper trusteeship
 
 
 [8]
 The Bill of Rights was originally introduced as an amendment on the Senate floor by Senator McClellan which was revised three days after its passage in an amendment introduced by Senator Kuchel, which was embodied without relevant change in the Landrum-Griffin bill in the House. That bill was adopted in committee and under the prevailing rule could not be amended on the floor. See, e.g., Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 831-42 (1960); Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn.L.Rev. 199 (1960). The legislative history of the Bill of Rights is reproduced at 2 Legislative History of the Labor Management Reporting and Disclosure Act of 1959, 1102-1119, 1220-1239, U.S. Code Cong. & Admin.News 1959, p. 2318
 
 
 [9]
 Summers, Democracy in Trade Unions, The New Leader, Feb. 10, 1958, p. 7
 
 
 [10]
 Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 644 (1959)