John SERTIC, Julius B. Conrad, Edward P. Barberic, etc., Plaintiffs-Appellants,

v.

CUYAHOGA, LAKE, GEAUGA AND ASHTABULA COUNTIES CARPENTERS DISTRICT COUNCIL OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., Defendants-Appellees.

No. 19550.

United States Court of Appeals, Sixth Circuit.

March 12, 1970.

Kenneth G. Weinberg, and James M. Friedman, Cleveland, Ohio, for plaintiffs-appellants; Gottfried, Ginsberg, Guren & Merritt, Cleveland, Ohio, on brief.

Jerome N. Curtis, and Marvin L. Karp, Cleveland, Ohio, for defendants-appellees; Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio, on brief.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

The principal question presented on this appeal is whether a referendum resulting in an increase in dues of labor union members, where the form of ballot gave the member no opportunity to vote against a dues increase without also voting against negotiations of a wage in-

crease, is a violation of § 411(a) (3) of the 1959 Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq. This statute, sometimes called the Landrum-Griffin Act, is referred to herein as "the Act." [1]

Appellants are members of the seventeen local unions in Ohio which constitute the Cuyahoga, Lake, Geauga and Ashtabula Counties Carpenters District Council of the United Brotherhood of Carpenters & Joiners of America. The District Council with its president and secretary were defendants in the District Court and are appellees herein. Plaintiffs-appellants began this suit under the Act on behalf of themselves and other members similarly situated to contest the validity of a referendum which authorized the District Council to negotiate with the employers for an increase in wages and other compensation and also provided for a wage assessment.

Appellants assert that the wage assessment of eleven cents per hour negotiated under authority of the referendum was equivalent to a dues increase of $20 per month per employee for each employee working an average 40 hour week (thereafter reduced to approximately $15 per month). It is further averred that by virtue of this assessment the total amount collected by the District Council

as of the time of the trial was in excess of one million dollars, of which approximately $500,000 represented surplus funds then held and not earmarked for any Union contingent liability or expense. The complaint prayed that future collection of this assessment be enjoined and that moneys collected under the assessment be reimbursed to those members who have paid it. On appeal appellants do not ask for a distribution of *all* funds collected under the assessment but only for a pro rata distribution of the surplus funds not yet expended or earmarked and now held by defendants.

After six days of trial the District Court entered a delayed order granting the motion to dismiss the complaint. Plaintiffs appeal from the order of dismissal. We reverse and remand. We construe the wage assessment to constitute an increase in dues in practical effect and within the meaning of the Act.

Appellee District Council is composed of some eight thousand members. As has been the trend in recent years, more and more money has been required to operate various Union activities. The Union locals and District Councils also are required to pay dues to the International union. As a result of this need for additional funds, the District Council in

---

1. The Act provides as follows:

"(3) *Dues, initiation fees, and assessments.*—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

"(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

"(B) in the case of a labor organization, other than a local labor organization or a federation of national or in-

ternational labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and by-laws of such labor organization: *Provided*, That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization."

1964 sought to raise the dues of the members of the various locals. To secure the consent of the members the following ballot was utilized:

January 1964

# OFFICIAL BALLOT

Cuyahoga, Lake, Geauga and Ashtabula Counties
Carpenters District Council

PLEASE READ BALLOT THOROUGHLY BEFORE VOTING

Mark Your Ballot With an X

| 1 | Shall the District Council have authority to negotiate a new Agreement with Employers? | Yes | No |
|---|---|---|---|
| 2 | Shall the District Council have authority to call a strike or stop work on jobs where the Employers have refused to sign an Agreement with the District Council? | Yes | No |
| 3 | Shall the District Council participate with the Policy Committee of the Building Trades Council? | Yes | No |
| 4 | Shall the District Council Negotiate a Hiring Hall Procedure with the Employers? | Yes | No |
| 5 | Shall the District Council negotiate fringe benefits (hospitalization, pensions, paid vacations, holidays, etc.)? | Yes | No |
| 6 | Effective July 1, 1964, shall the future dues be increased Two Cents (2c) for each One Dollar ($1.00) per month raise in the wages and fringe benefits? This proposed dues increase shall be divided equally between the Local Union and the District Council. | Yes | No |

This referendum resulted in a rejection of the proposed dues increase set forth in Issue 6. On November 12, 1966, the District Council leaders met with leaders

of the seventeen locals to discuss the financial conditions of the various locals and to determine a method of securing additional funds. At this meeting it was pointed out that the contracts with the various employers soon were to expire and that the Council would be negotiating for a new contract which would cover three years. It was proposed that the negotiating committee be authorized to negotiate for a total pay raise of at least $1.00 per hour in wages and that a two per cent working wage assessment be approved. It further was proposed that the negotiating committee be empowered to call a strike in support of these demands, if the committee considered it to be necessary.

Perhaps on the basis of the lesson from the defeat on the dues increase submitted in the 1964 referendum, the Council leaders submitted a ballot with only three questions.[2]

The three questions in the 1967 ballot were as follows:

JANUARY 1967

# OFFICIAL BALLOT

Cuyahoga, Lake, Geauga and Ashtabula Counties
Carpenters District Council

PLEASE READ BALLOT THOROUGHLY BEFORE VOTING

Mark Your Ballot With an X

| | | Shall the District Council negotiate a new 3-year agreement with a wage increase of at least $1.00 per hour plus a 2% gross wage assessment? | Yes | No |
|---|---|---|---|---|
| | 1 | | | |
| | 2 | Shall the District Council have the authority to call a strike or stop work on jobs where the Employers have refused to sign an agreement with the District Council? | Yes | No |
| | 3 | Shall the District Council negotiate additional fringe benefits (pensions, paid vacations, holidays, etc.?) | Yes | No |

In the 1967 referendum all three issues were approved.

Subsequent to the filing of the complaint in the present case, the District

2. This ballot as well as the ones used in the 1964 referendum varied somewhat from local to local as various skills are involved and different wage increases were being sought.

Council sent a mail ballot to each member of each local Union proposing to reduce the assessment from two per cent to one and one-half per cent. As a result of a favorable vote the assessment was reduced. Appellees contend that, even if there was any infirmity in the original referendum, this later mail ballot resulting in a reduction of the assessment constituted a ratification of the results of the two per cent assessment negotiated by authority of the original referendum.

Appellants contend that Issue One in the January 1967 referendum violated § 411(a) (3) of the Act (n. 1) in that it contained multiple questions and precluded a meaningful vote on the dues issue alone. In order to authorize the District Council to negotiate a new three year agreement with a wage increase of at least $1.00 per hour the members of necessity were compelled to vote in favor of authorizing a two per cent gross wage assessment against their wages. The voter thus was faced with a package proposition which presented a dilemma. He had no way to approve the negotiation of a wage increase without simultaneously approving the negotiation of the two per cent assessment against his wages. It was impossible for a voter to reject negotiation of the wage assessment, which would effect an increase in his dues, without also rejecting authorization for negotiation of a wage increase of at least $1.00 per hour.

Appellee Brackenridge, secretary of the District Council, was asked at the trial:

"Q. Can you tell me, Mr. Brackenridge, how it would be possible for a member to vote 'Yes' on negotiating a new agreement with a wage increase and vote 'No' on a wage assessment under the ballot that you presented the members with?

And Mr. Brackenridge answered:

"I don't know how you could do it."

At oral argument on this appeal both sides were asked to submit additional authorities on the use of multiple question issues in a referendum involving dues increases under the Act. Appellees submitted Brooks v. Local No. 30, 187 F.Supp. 365 (E.D.Pa.) in which an ambiguous but single question was placed on a ballot and the District Court upheld the referendum. This is a different situation from that presented here where more than one topic or subject is included in the issue. Appellants offered no decisions under the Act but submitted a number of State cases disapproving multiple question issues, such as Blaine v. City of Seattle, 62 Wash. 445, 114 P. 164; Gray v. Mount, 45 Iowa 591, 595 and Lewis v. Commissioners of Bourbon City, 12 Kan. 186.

We have not been able to find any case involving multiple question issues in a referendum covered by the Act. The Second Circuit was faced with a somewhat similar problem in Navarro v. Gannon, 385 F.2d 512 (2d Cir.). The question was the right of a local union to be free of interference from the International Union, a matter not specifically covered by the Act or prior cases. Chief Judge Lumbard said:

"This question was apparently not considered in the congressional debates leading to passage of the Bill of Rights in the LMRDA. That the legislative history of these provisions of the Act includes no mention of circumstances such as those which give rise to this case does not compel the conclusion that no protection was intended by the Congress. The Bill of Rights that appears as Title I of the Act was hastily drafted and included without much debate. The debate on the guaranty of a right of assembly in Section 101(a) (2) was chiefly concerned with enabling members to confer outside regular meetings for the purpose of discussing union affairs without fear of reprisal by union officials. 105 Cong. Rec. 5812 (daily ed. April 22, 1959) remarks of Sen. McClellan); * * *."
385 F.2d at 517.

The legislative history of the bill of rights in the Act was summarized by Judge Lumbard in a footnote as follows:

"The Bill of Rights was originally introduced as an amendment on the Senate floor by Senator McClellan which was revised three days after its passage in an amendment introduced by Senator Kuchel, which was embodied without relevant change in the Landrum-Griffin bill in the House. That bill was adopted in committee and under the prevailing rule could not be amended on the floor. See, e. g., Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 831–42 (1960); Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn.L.Rev. 199 (1960). The legislative history of the Bill of Rights is reproduced at 2 Legislative History of the Labor Management Reporting and Disclosure Act of 1959, 1102–1119, 1220–1239, U.S.Code Cong. & Admin. News 1959, p. 2318." 385 F.2d 512 at 517

We must determine whether the use in a referendum of an issue containing both an increase in dues and a wage increase violates the Act. We decide this question without any clear indicia of Congressional intent on this specific point.

In Navarro v. Gannon, *supra,* the Court further said:

"The LMRDA was enacted with the clear purpose of assuring 'the full and active participation by the rank and file in the affairs of the union.' American Federation of Musicians v. Wittstein, 379 U.S. 171, 182–183, 85 S.Ct. 300, 307, 13 L.Ed.2d 214 (1964). The Congress by passing a 'Bill of Rights' for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values in the labor movement." 385 F.2d at 518

■ In enacting this statute Congress intended to restore to members of labor unions the right to participate freely in the government of their union. This necessarily would include the right to vote "yes" or "no" on increases of dues or assessments without coercion.

■■ We hold that Issue One in the 1967 referendum, quoted above, by combining the authorization to negotiate a wage increase with authorization to negotiate a wage assessment, precluded a vote solely on the issue of the wage assessment. Union members are entitled under the Act to the right of a meaningful vote on increases in dues or assessments. Appellees undertake to draw a distinction between dues and the gross wage assessment imposed in the present case. We construe this to be a distinction without a difference. The two per cent dues increase submitted as Issue Six on the ballot in the 1964 referendum, which was rejected, is for all practical purposes the same as the wage assessment submitted as Issue One on the ballot in the 1967 referendum. The entire economic impact of the wage assessment, like Union dues, was upon the pocketbooks of Union members. We therefore hold that Issue One of the referendum under the facts of this case did not comply with the requirements of the Act. Accordingly we reverse the judgment of the District Court.

■ We further hold that the subsequent reduction in the assessment from two per cent to one and one-half per cent did not constitute a ratification of the earlier referendum and did not cure the illegality of the wage assessment.

■ Contrary to the contentions of appellees we hold that appellants have

standing to contest the 1967 referendum in this class action on behalf of themselves and other members similarly situated. Rule 23, Fed.R.Civ.P.

Appellants also attack the validity of the referendum on other grounds, relying upon Local No. 2 v. International Brotherhood of Telephone Workers, 362 F.2d 891 (1st Cir.). In view of our holding on Issue One of the referendum, it is not necessary for this Court on the present appeal to pass upon the other questions raised by appellants.

On remand the District Court is directed to enter an order enjoining future collections of the wage assessment unless and until it is approved in a referendum complying with the Act.

■ There remains the question of whether this Court should require the Union to reimburse to members all funds collected under the invalid wage assessment. Appellants concede that part of the funds so collected already have been expended by the Union. On appeal they ask for a pro rata refund of that part of the proceeds of the wage assessment which remain in the District Council treasury "as surplus funds not earmarked or allocated for any specific expenditure or contingency and not necessary for the orderly operation of the District Council or any of the local unions." This Court is not disposed to grant this relief on the record before us. Any funds collected under the wage assessment and currently in the possession of the District Council belong to the members of the various locals making up the District Council. It is for these members to decide what disposition should be made of these funds in accordance with the Union constitution and bylaws. The District Court has jurisdiction to supervise this disposition, if found to be necessary, and to enter appropriate orders.

Reversed and remanded for further proceedings not inconsistent with this opinion.